1  Eugene J. Egan (State Bar No. 130108)
     *eje@manningllp.com*
2  Christopher A. Kanjo (State Bar No. 128015)
     *cak@manningllp.com*
3  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
4  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
5  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
6
   Attorneys for Defendant HI DESERT
7  MOBILE HOME PARK LP (erroneously
   sued as "CAPRI APARTMENTS AT
8  ISLA VISTA")

9            **UNITED STATES DISTRICT COURT**

10   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  JUNAN CHEN, KELLY YAO WANG,        Case No. 2:15-CV-01509- JFW (JEMx)
    CHANGSHUANG WANG,                  [The Hon. John F. Walter]
13  JINSHUANG LIU, LICHU CHEN, and
    WENQUEI HONG,
14                                     **NOTICE OF MOTION AND**
                                       **MOTION BY DEFENDANT HI**
15        Plaintiffs,                  **DESERT MOBILE HOME PARK**
                                       **L.P. TO DISMISS PLAINTIFFS'**
16        v.                           **FIRST AMENDED COMPLAINT**
                                       **FILED MAY 20, 2015;**
17  COUNTY OF SANTA BARBARA;           **MEMORANDUM OF POINTS AND**
    SANTA BARBARA COUNTY               **AUTHORITIES IN SUPPORT**
18  SHERIFF'S DEPARTMENT; CAPRI
    APARTMENTS AT ISLA VISTA;          Date:  July 13, 2015
19  ASSET CAMPUS HOUSING, and          Time: 1:30 p.m.
    DOES 1 through 200, Inclusive,     Ctrm, 16
20
          Defendants.                  Trial Date:  April 26, 2016
21

22  TO PLAINTIFFS JUNAN CHEN, KELLY YAO WANG, HANGSHUANG

23  WANG, JINSHUANG LIU, LICHU CHEN, AND WENQUEI HONG, AND TO

24  THEIR ATTORNEYS OF RECORD HEREIN:

25        NOTICE IS HEREBY GIVEN that on the 13th day of July, 2015, at

26  1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 16 of the

27  above-captioned Court, located at 312 North Spring Street, Los Angeles, California,

28  90012, defendant HI DESERT MOBILE HOME PARK LP (erroneously sued as

1

1   "CAPRI APARTMENTS AT ISLA VISTA") ("Capri") will move this Court for the

2   following order as to plaintiffs' first amended complaint filed on May 20, 2015:

3       1.      For an order dismissing plaintiffs' second cause of action for negligence

4   as against defendant Capri, for failure to state a claim upon which relief can be

5   granted.  (Fed.R.Civ.P. 12(b)(6)).

6       This motion is made and based on this notice of motion, the attached

7   memorandum of points and authorities, the papers and records on file in this action,

8   and upon such additional documents and argument as may be properly before this

9   Court at the time of the hearing on this motion.

10      This motion is made following the conference of counsel, pursuant to L.R. 7-

11  3 and Section 5.b. of this Court's standing order, which took place on May 26, 2015.

12  In accordance with this Court's order of May 28, 2015, this conference of counsel

13  was in-person, counsel filed their respective declarations within 3 days after this

14  conference, and defendant waited two days after the last declaration of counsel was

15  filed before filing this motion.

16

17  DATED:  June 11, 2015              **MANNING & KASS**

18                                     **ELLROD, RAMIREZ, TRESTER LLP**

19

20                              By:      /s/ Eugene J. Egan

21                                     Eugene J. Egan, Esq.

22                                     Attorneys for Defendant

23                                     HI DESERT MOBILE HOME PARK LP

24                                     (erroneously sued as "CAPRI
                                       APARTMENTS AT ISLA VISTA")

25

26  ///

27  ///

28

2

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................... 3

II.   SUMMARY OF THE ALLEGATIONS OF PLAINTIFFS' FIRST
      AMENDED COMPLAINT.................................................................... 4

III.  THE COURT SHOULD DISMISS PLAINTIFFS' CAUSE OF
      ACTION FOR NEGLIGENCE BECAUSE DEFENDANT HAD NO
      DUTY TO PERFORM THE MEASURES PLAINTIFFS WOULD
      IMPOSE AS A MATTER OF LAW........................................................ 8

      A.    Measures Which Plaintiffs Claim Should Have Been Performed
            By Defendant ............................................................................. 9

      B.    The Burden Placed On Defendant To Undertake These Measures ........ 9

      C.    The Homicidal Rampage Of Rodger Was So Unlikely That
            Liability Cannot Be Imposed Upon Defendant .................................. 12

IV.   THE COURT SHOULD DISMISS PLAINTIFFS' CAUSE OF
      ACTION FOR NEGLIGENCE BECAUSE DEFENDANT HAD NO
      ACTUAL KNOWLEDGE OF ANY FACTS MAKING RODGER'S
      HOMICIDAL RAMPAGE FORESEEABLE.......................................... 12

      A.    Plaintiffs' Allegations As To Defendant's Actual Knowledge Are
            Conclusory And Self-Contradictory ................................................ 13

      B.    Plaintiffs' First Amended Complaint Does Not State A Plausible
            Claim For Relief Against Defendant Based Upon The Actual
            Knowledge Alleged..................................................................... 14

            1.    Incident Of August of 2011 Between Rodger And His
                  Hispanic Roommates ......................................................... 16

            2.    Incident In January of 2012 Between Rodger And
                  Roommate Horowitz........................................................... 16

            3.    Incidents of September 11, 2012 and July 20, 2013 .................. 18

            4.    Law Enforcement Visits Of January 15, 2014 and April
                  30, 2014 ......................................................................... 19

V.    CONCLUSION .................................................................................... 21

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

Ashcroft v. Iqbal, 556 U.S. 662,129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) 15, 17, 18

Waldo v. Eli Lilly & Co., 2013 WL 5554623, 2013 U.S. Dist. LEXIS 145772
        (E.D. Cal. Oct. 7, 2013)..............................................................18, 20

**STATE CASES**

Ballard v. Uribe, 41 Cal. 3d 564 (1986) ......................................................12

Barber v. Chang, 151 Cal. App. 4th 1456 (2007)........................................13

Castaneda v. Olsher, 41 Cal.4th 1205 (2007)............................................8, 9

Davis v. Gomez, 207 Cal.App.3d 1401 (1989) ......................................10, 19

Delgado v. Trax Bar & Grill, 36 Cal. 4th 224 (2005) ................................13

Johnson v. City & County of San Francisco, 137 Cal.App.4th 7 (2006) ..................11

Lopez v. McDonald's Corp., 193 Cal.App.3d 495 (1987)........................12

Margaret W. v. Kelley R., 139 Cal. App. 4th 141 (2006) ........................13

Pettus v. Cole, 49 Cal. App. 4th 402 (1996)..............................................11

**OUT OF STATE CASES**

Gill v. New York City Housing Authority, 130 A.D. 2d 256, 519 N.Y.S.2d
        364 (1987) ...............................................................................10

**STATUTES**

California Government Code §12926..........................................................11

California Government Code §12955..........................................................11

California Government Code §12955.3.......................................................11

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On May 23, 2014, Elliot Rodger killed his roommates Hong and Wang, and their friend Chen, with knives and other weapons in an apartment which defendant HI DESERT MOBILE HOME PARK LP (sued and served herein as "Capri Apartments at Isla Vista") ("defendant" or "Capri") rented to Hong, Wang, and Rodger.

Plaintiffs are the parents of Hong, Wang, and Chen.  In their sole cause of action for negligence against defendant, they allege that defendant had a duty to protect Hong, Wang, and Chen from Rodger's homicidal rampage, in which a total of six people were killed and fourteen more were injured.

Defendant submits that the allegations of plaintiffs' first amended complaint are insufficient to impose a duty upon defendant to protect plaintiffs' decedents from Rodger's criminal acts.

The measures plaintiffs assert defendant should have undertaken as its duty—investigate Rodger to ensure that he was a "safe" and "appropriate" roommate, warn prospective roommates of Rodger's mental illness and dangerous propensities, and either house Rodger separately or evict him—would have imposed an undue burden upon defendant.  Lacking the qualifications to identify, yet alone diagnose, mental illness or propensity for violence in Rodger—or in any other tenant—satisfying the duty alleged would require defendant to hire mental health professionals to screen all tenants.  It would further require defendant to either warn other tenants of certain findings, or use those findings to evict tenants.  The resultant burden to defendant would be significant expense for hiring qualified professionals, a substantial risk of violating the right of privacy of all tenants and of unlawfully discriminating against tenants identified as having a mental disability, and the financial burden of resultant litigation.

Further, the actual duty which the case law imposes upon defendant is based upon actual knowledge.  Plaintiffs' allegations concerning defendant's actual knowledge of Rodger's propensity for violence are based upon six incidents that occurred over a period of two years and eight months.  Plaintiffs' allegations are conclusory and not supported by sufficient factual allegations, and regardless, the nature of these six incidents did not give defendant actual knowledge of Rodger's criminal propensities.

Accordingly, this Court should grant defendant's motion to dismiss plaintiffs' first amended complaint.

## II.      SUMMARY OF THE ALLEGATIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT

In their first amended complaint for damages filed on May 20, 2015, plaintiffs allege that they are the surviving parents of George Chen ("Chen"), David Wang ("Wang"), and James Hong ("Hong") [¶¶3-8][1], who were all killed in the apartment of Wang and Hong on May 23, 2014, by roommate Elliot Rodger ("Rodger"). [¶41].

Defendant operates a multi-unit student housing property in Isla Vista that primarily services students of the University of California at Santa Barbara and Santa Barbara City College ("SBCC") [¶20], which included Apartment 7 ("Apt. 7") on Seville Road [¶21], where Rodger was assigned to live with Hong and Wang in September of 2013.  [¶36].  Plaintiffs further allege that co-defendant Asset Campus Housing managed defendant's student housing property.  [¶19].

Plaintiffs assert a claim for negligence against defendant, seeking general and special damages for plaintiffs' resulting emotional and physical damages.  [¶57].

On June 4, 2011, Rodger moved to Isla Vista to attend the summer session at SBCC.  [¶21].  Defendant paired Rodger with two roommates to live with in Apt. 7

---

[1] All subsequent bracketed references will be to plaintiffs' first amended complaint filed on May 20, 2015 (Doc. 35) unless otherwise noted.

4

1  in the main Capri complex on Seville Road.  [¶21].

2      In August of 2011, after the summer session ended at SBCC, Rodger's

3  roommates moved out and Rodger lived in Apt. 7 alone for about a month.  [¶22].

4  Then defendant assigned two new roommates, both male Hispanics, to Apt. 7.

5  [¶22].  Rodger considered them to be "rowdy, inferior, pig-faced thugs" [¶22].

6  Within days after they moved in, Rodger confronted these roommates, insulting

7  them and telling them that he was superior.  [¶22].  One of Rodger's roommates had

8  to be restrained by the other.  [¶22].  Rodger went to the leasing manager and

9  explained everything that had happened.  [¶22].  Shortly thereafter, Rodger signed a

10  lease for another, larger apartment.  [¶22].

11      In September of 2011, Rodger moved into his new apartment and Capri

12  assigned Spencer Horowitz ("Horowitz") as his roommate.  [¶23].  After a few

13  weeks Rodger developed a self-described "psychological problem" because Rodger

14  believed that Horowitz could see how pathetic Rodger's life was.  [¶23].

15      In January of 2012, Rodger became enraged when Horowitz brought a girl

16  back to his room.  [¶24]    Rodger was furious and jealous because he believed that

17  Horowitz was "chubby" and "even shorter than [he] was".  [¶24]  Rodger told

18  Horowitz that he was foolish for being so proud of having "an ugly whore" in his

19  room.  [¶24].  Afterwards, Rodger and Horowitz became hostile toward each other

20  and their roommate relationship became unworkable.  [¶24].

21      On information and belief, plaintiffs allege that in January of 2012, Horowitz

22  began to fear for his personal safety.  Horowitz informed his father that he believed

23  Rodger to be mentally ill and posed a threat of violence.  [¶25].  Horowitz and his

24  father began taking action to remove Horowitz from his living situation due to the

25  danger posed by Rodger.  [¶25].  Horowitz and his father communicated to Capri,

26  both in in-person meetings and through written correspondence, that Rodger was a

27  threat and posed a danger to Horowitz.  [¶25].  Horowitz and his father eventually

28  arranged for Horowitz to move out of the apartment and find other living

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

5

1   accommodations.  [¶25].

2       On September 11, 2012, Rodger "threw a wild tantrum, screaming and crying

3   for hours on end", all the while thrashing the furniture with a wooden practice

4   sword, frustrated after he did not win a lottery jackpot drawing.  [¶27].  On

5   information and belief plaintiffs allege that Rodger's screaming was overheard by

6   Rodger's neighbors and the apartment manager.  [¶27].

7       In September 2012, Capri transferred Rodger back to Apt. 7 on Seville Road.

8   [¶28].  Rodger later wrote "I trusted that the manager had the sense to pair me with

9   mature people, knowing my experiences with those two barbaric housemates I had

10  to deal with a year previously."  [¶28].  After about a month (October of 2012),

11  CAPRI assigned Rodger two new roommates, whom he described as "timid geeks"

12  who were "quiet, respectful and friendly".  [¶28].  Rodger registered for classes and

13  then dropped them.  [¶28].

14      In November of 2012, after losing the Powerball lottery, Rodger cried for

15  hours and called his parents complaining that he was a 21 year old virgin, unable to

16  get a girlfriend or make friends, and expressed that he would never be happy.  [¶29].

17  Rodger's parents arranged for him to begin seeing a psychiatrist.  [¶29].

18      In April of 2013, Rodger posted hateful, angry, deeply misogynist and racist

19  material under his own name on various websites.  [¶32].  Virtually all of the

20  content Rodger had posted online was easily discoverable with simple Google

21  searches of his name. [¶32].

22      On July 20, 2013, Rodger went to a party in Isla Vista in an intoxicated state.

23  [¶34].  He became angry at a group of girls whom he believed were ignoring him,

24  and tried to push some of them off a ledge.  [¶34].  A group of male students

25  intervened and pushed Rodger off the ledge, breaking his ankle.  [¶34]  As he

26  stumbled away from the party, Rodger realized that he had lost his Gucci sunglasses

27  during the altercation.  [¶34].  Rodger went to the wrong house and demanded his

28  sunglasses back.  [¶34].  The occupants of this house called Rodger names and

1   began kicking and punching him.  [¶34].  Rodger left this house and fled the area.

2   [¶34].  Rodger returned home bruised, disheveled and crying, and told a neighbor at

3   the Capri Apartments "I'm gonna kill all those motherf***kers and kill myself."

4   [¶34].  Plaintiffs allege on information and belief that this conversation was

5   overheard by Rodger's neighbors and the apartment manager.  [¶34].

6        On July 21, 2013, Rodger called his father to tell him that he had been

7   injured.  [¶35].  Rodger's father drove up from Los Angeles to take him to the

8   hospital.  [¶35].  At the hospital, Rodger was interviewed by two deputies from the

9   Santa Barbara County Sheriff Department ("SBCSD").  [¶35].  Rodger made up a

10  story that he had been pushed off the ledge by bullies.  [¶35].  The deputies

11  interviewed others who said that Rodger was the only aggressor and had targeted

12  women.  [¶35].  The deputies did no further follow up and the matter was dropped.

13  [¶35].

14       In September of 2013, after surgery on his ankle and a period of recuperation

15  at his mother's house, Rodger returned to Apt. 7.  [¶36].  Capri assigned Hong and

16  Wang as his roommates in Apt. 7.  [¶36].

17       On January 15, 2014, Rodger became annoyed at his roommates because he

18  did not like the smell of their cooking.  [¶37].  Rodger responded by repeatedly

19  hiding or taking their pots and pans so they could not cook.  [¶37].  Hong and Wang

20  repeatedly asked, and then repeatedly demanded, the return of their property.  [¶37].

21  Eventually, when Rodger did not comply, Hong took Rodger's candles and candle

22  holders and again demanded the return of his pots and pans.  [¶37].  Rodger then

23  place Hong under citizen's arrest and Rodger called the SBCSD.  [¶37].  After the

24  deputies arrived at Apt. 7 and interviewed all parties, they arrested Hong for an

25  infraction (petty theft).  [¶37]  This charge against Hong was ultimately dismissed

26  due to insufficient evidence. [¶37].  Plaintiffs allege on information and belief that

27  defendant was aware that law enforcement officer had come to Apt. 7 due to a

28  dispute between Rodger and his roommates.  [¶37].

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1      In April of 2014, Rodger uploaded numerous videos to YouTube expressing

2 his jealousy and rage toward women, minorities, and sexually active people.  [¶39].

3      On April 30, 2014, SBCSD visited Rodger for a "wellness check" in response

4 to a call by a mental health worker who had seen Rodger's online content.  [¶40].

5 The deputies spoke to Rodger at the doorstep of the apartment but did not ask to

6 enter the apartment or search his room.  [¶40]. They left after Rodger told them that

7 it was a misunderstanding. [¶40].  Plaintiffs allege on information and belief that

8 defendant was aware that law enforcement had come to Apt. 7 to conduct a welfare

9 check on Rodger.  [¶40].

10      On May 23, 2014, Rodger killed Hong and Wang, and their visiting friend

11 Chen, with knives and other weapons in Apt. 7.  [¶41].  Rodger then emailed his

12 manifesto to his parents, family friends, and at least one therapist.  [¶41].  Rodger

13 then headed out to Isla Vista to continue his "rampage", leaving 3 more people dead

14 and 14 wounded.  [¶41].

### III.   THE COURT SHOULD DISMISS PLAINTIFFS' CAUSE OF ACTION FOR NEGLIGENCE BECAUSE DEFENDANT HAD NO DUTY AS A MATTER OF LAW TO PERFORM THE MEASURES PLAINTIFFS WOULD IMPOSE

19      "A landlord generally owes a tenant the duty, arising out of their special

20 relationship, to take reasonable measures to secure areas under the landlord's control

21 against foreseeable criminal acts of third parties. [citations].  In each case...the

22 existence and scope of a property owner's duty to protect against third party crime is

23 a question of law for the court to resolve. [citations]." Castaneda v. Olsher, 41

24 Cal.4th 1205, 1213 (2007).

25      "The duty analysis…requires the court in each case (whether trial or

26 appellate) to identify the specific action or actions the plaintiff claims the defendant

27 had a duty to undertake…. 'First, the court must determine the specific measures the

28 plaintiff asserts the defendant should have taken to prevent the harm. This frames

1   the issue for the court's determination by defining the scope of the duty under

2   consideration. Second, the court must analyze how financially and socially

3   burdensome these proposed measures would be to a landlord, which measures could

4   range from minimally burdensome to significantly burdensome under the facts of

5   the case. Third, the court must identify the nature of the third party conduct that the

6   plaintiff claims could have been prevented had the landlord taken the proposed

7   measures, and assess how foreseeable (on a continuum from a mere possibility to a

8   reasonable probability) it was that this conduct would occur." Castaneda, supra, 41

9   Cal. 4th at 1214.

10      "Once the burden and foreseeability have been independently assessed, they

11   can be compared in determining the scope of the duty the court imposes on a given

12   defendant. The more certain the likelihood of harm, the higher the burden a court

13   will impose on a landlord to prevent it; the less foreseeable the harm, the lower the

14   burden a court will place on a landlord.' [citation].  Again, other Rowland factors

15   may come into play in a given case, but the balance of burdens and foreseeability is

16   generally primary to the analysis.  [citation]." Castaneda, supra, 41 Cal. 4th at 1214.

17      **A.      Measures Which Plaintiffs Claim Should Have Been Performed By**

18      **Defendant**

19      In this case, the specific measures which plaintiffs assert that defendant

20   should have undertaken were to (1) investigate Rodger, including a background

21   check and his online postings, to ensure that he was a "safe" and "appropriate"

22   roommate [¶¶ 36 and 56], (2) warn prospective roommates of Rodger's mental

23   illness, violent demeanor, dangerous propensities, racial biases, and serious conflicts

24   with his previous roommates [¶¶ 36, 53, 56], and (3) either house Rodger separately

25   from roommates to whom he posed a potential threat or evict him. [¶¶ 36, 53, 56].

26      **B.      The Burden Placed On Defendant To Undertake These Measures**

27      Plaintiffs seek to impose an extreme burden upon defendant: to identify and

28   clinically diagnose its tenants for mental illness and dangerous propensities, and

9

then to use that diagnosis to warn other tenants or to evict tenants.  Such a duty is not supported by the law.  "'This Court does not believe that any landlord should be expected to check the references or background of a prospective tenant for reasons other than to protect the landlord's *own* interest.'"  Davis v. Gomez, 207 Cal.App.3d 1401, 1406 (1989) (emphasis in original).  See also: Gill v. New York City Housing Authority, 130 A.D. 2d 256, 261, 519 N.Y.S.2d 364 (1987)  [Plaintiff "presupposes that defendant had some duty to investigate [the assailant] so as to be able to assess his potential for dangerous behavior.  This is not the case." (bracketed material added)].

As a landlord, defendant was not qualified to make a determination as to Rodger's mental illness and dangerous propensities.  "The determination as to whether a mentally ill individual is dangerous or will become dangerous is one which is often difficult for even the most highly trained mental health professionals to make reliably.  [citation].  It is, accordingly, not the sort of determination which landlords, who possess no special expertise in the field of mental health, should be required to make.  A mentally ill individual whose behavior gives cause for concern should be evaluated by qualified professionals as permitted by law and treated if necessary.  It is not the province of a landlord to perform such an evaluation, nor should the results of such an evaluation be a predicate for a tenant's eviction.  Those who suffer from mental illness should, where appropriate, be treated and, if necessary, institutionalized.  They should not on the basis of their clinical condition be evicted.  [citation]."  Gill, supra, 130 A.D. 2d at 263.  "'Nor was it within the reasonable province of either [the apartment manager] or his employer to diagnose [the tenant] as "psychotic"'".  Davis, supra, 207 Cal.App.3d at 1406 (bracketed material added).

Lacking the qualifications to make this diagnosis itself, defendant would be forced incur a substantial financial burden in hiring mental health professionals for this purpose.

1    Burdening defendant with an unworkable duty to disclose these findings to

2    other tenants, or to use these findings to evict other tenants, would substantially risk

3    violating those tenant's right to privacy under Article I, Section 1 of the California

4    Constitution, and would constitute unlawful discrimination against those tenants on

5    the basis of their disability under California Fair Employment and Housing Act.

6    "[I]t is well settled that the zone of privacy created by that provision extends

7    to the details of a patient's medical and psychiatric history [citations].  The right to

8    control circulation of personal information is fundamental. [Citations.] This right

9    reaches beyond the interests protected by the common law right of privacy, and may

10   be protected from infringement by either the state or by any individual. [Citation.] "

11   Pettus v. Cole, 49 Cal. App. 4th 402, 440 (1996).

12   Under California Government Code §12955, it is unlawful "[f]or the owner of

13   any housing accommodation to discriminate against or harass any person because of

14   the… disability… of that person" [California Government Code §12955(a)].

15   Additionally, California Government Code §12955(k), makes it unlawful "[t]o

16   otherwise make unavailable or deny a dwelling based on discrimination because

17   of… disability…."  "Disability" under the Act includes, but is not limited to, any

18   "mental or psychological disorder or condition".  California Government Code §

19   12926(j), as incorporated by California Government Code § 12955.3.

20   "Conducting an investigation as to whether a tenant has a disability would be

21   especially onerous in light of the fact that it is unlawful '[f]or the owner of any

22   housing accommodation to make or to cause to be made any written or oral inquiry

23   concerning the disability of any person seeking to… rent or lease any housing

24   accommodation.' [citation]."  Johnson v. City & County of San Francisco, 137

25   Cal.App.4th 7, 17 (2006) (citing California Government Code §12955(b)).

26   Thus, defendants then would face another substantial financial burden of

27   having to defend litigation brought by those tenants for violation of their right of

28   privacy, and for unlawful discrimination in housing accommodations.

C. **The Homicidal Rampage Of Rodger Was So Unlikely That Liability Cannot Be Imposed Upon Defendant**

Finally, the likelihood of a homicidal rampage by a tenant is so remote that the scope of the duty does not encompass the measures identified by plaintiffs. "The foreseeability of a particular kind of harm plays a very significant role in this calculus [citation], but court's task -- in determining 'duty' -- is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather *to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party*." Ballard v. Uribe, 41 Cal. 3d 564, 572, n. 6 (1986) (emphasis added).

"[T]he risk of a maniacal, mass murderous assault is not a hazard the likelihood of which makes [defendant's] conduct unreasonably dangerous. Rather, the likelihood of this unprecedented murderous assault was so remote and unexpected that, as a matter of law, the general character of [defendant's] nonfeasance did not facilitate its happening. [The assailant's] deranged and motiveless attack… is so unlikely to occur within the setting of modern life that a reasonably prudent business enterprise would not consider its occurrence in attempting to satisfy its general obligation to protect business invitees from reasonably foreseeable criminal conduct." Lopez v. McDonald's Corp., 193 Cal.App.3d 495, 509-510 (1987) (bracketed material added).

IV. **THE COURT SHOULD DISMISS PLAINTIFFS' CAUSE OF ACTION FOR NEGLIGENCE BECAUSE DEFENDANT HAD NO ACTUAL KNOWLEDGE OF ANY FACTS MAKING RODGER'S HOMICIDAL RAMPAGE FORESEEABLE**

[F]oreseeability is a "crucial factor" in determining the existence and scope of a legal duty [citation][fn. omitted] and... '[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the

1   court' [citation]."  <u>Delgado v. Trax Bar & Grill</u>, <u>36 Cal. 4th 224</u>, 237 (2005).

2   "'[W]hen the third party crime is committed by a tenant, foreseeability turns

3   on whether the landlord had "notice of [the tenant's] propensity for violence."

4   [citations]."  <u>Barber v. Chang</u>, <u>151 Cal. App. 4th 1456</u>, 1464 (2007).  "What is

5   apparent from all these cases analyzing defendants' liability for the criminal conduct

6   of a third party is that foreseeability is the crucial factor [citation] and that—no

7   matter whether a heightened or lesser degree of foreseeability was required and no

8   matter whether the actual crime committed or only similar conduct needed to be

9   foreseen—*foreseeability must be measured by what the defendant actually knew.*

10  None of these cases has held that a defendant owed a duty to take steps to prevent or

11  respond to third party crime on the basis of constructive knowledge or information

12  the defendant should have known. We are not aware of any case involving liability

13  for third party criminal conduct that has held that a special relationship creates a

14  duty to investigate or that has charged a defendant with making forecasts based on

15  the information such an investigation might have revealed." <u>Margaret W. v. Kelley</u>

16  <u>R.</u>, <u>139 Cal. App. 4th 141</u>, 156 (2006) (emphasis added).[2]

17      **A.      Plaintiffs' Allegations As To Defendant's Actual Knowledge Are**

18              **Conclusory And Self-Contradictory**

19      Plaintiffs allege that defendant had actual knowledge of (1) Rodger's "bizarre

20  behavior" [¶36], (2) Rodger's racial biases, mental illness, and dangerous

21  propensities [¶¶ 52, 53], (3) Rodger's history of conflicts with his roommates [¶36],

22  and (4) that Rodger was a violent and dangerous threat to his roommates [¶¶ 36, 52]

23  who "would cause harm to any potential roommates he was paired with".  [¶52].

24      Plaintiffs' allegation that Rodger would cause harm to "any potential

25  _____

26  [2] Thus, to the extent that plaintiffs allege that defendant had "constructive

27  knowledge" of Rodger's bizarre behavior [¶36], history of conflicts with his
    roommates [¶36], racial biases, mental illness, and dangerous propensities [¶¶ 36,

28  52], this constructive knowledge does not impose any duty upon defendant.

1    roommates he was paired with" [¶52], is contradicted by plaintiffs' allegation that in

2    October of 2012, Rodger was assigned two new roommates.  [¶28]  Rodger

3    described these two roommates as "'timid geeks' who were 'quiet, respectful and

4    friendly'".  [¶28]  There are no allegations that Rodger posed a threat to these two

5    roommates in plaintiff's first amended complaint, and Rodger appears to have been

6    paired with these two roommates for almost one year, until September of 2013,

7    when Rodger was paired with Hong and Wang.  [¶36].  The implicit admission of

8    these allegations is that Rodger did not cause harm to these two roommates.

9         Also, plaintiffs' allegation of Rodger's "bizarre behavior" [¶36], is

10   contradicted by the allegation that during the dispute with Hong and Wang on

11   January 15, 2015, Rodger called the SBCSD, properly seeking the intervention of

12   law enforcement to diffuse the situation.  [¶37].  Rodger's act of calling the deputies

13   was not "bizarre behavior".  It was not the act of a person who had "dangerous

14   propensities" toward violence.  And, as to the actual "history" of this "conflict", after

15   the SBCSD interviewed the parties, the deputies placed *Hong* under arrest, not

16   Rodger.  [¶37].

17   **B.**   **Plaintiffs' First Amended Complaint Does Not State A Plausible**

18        **Claim For Relief Against Defendant Based Upon The Actual**

19        **Knowledge Alleged**

20        "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a

21   'short and plain statement of the claim showing that the pleader is entitled to relief.'

22   As the Court held in Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929,

23   the pleading standard Rule 8 announces does not require 'detailed factual

24   allegations,' but it demands more than an unadorned, the-defendant-unlawfully-

25   harmed-me accusation.  [citations].  A pleading that offers 'labels and conclusions'

26   or 'a formulaic recitation of the elements of a cause of action will not do.' [citation].

27   Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further

28   factual enhancement.' [citation]."   Ashcroft v. Iqbal, 556 U.S. 662, 677-678,129 S.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
*Attorneys at Law*

14

Ct. 1937, 173 L. Ed. 2d 868 (2009).

"Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [citation].  Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. [citation].   Determining whether a complaint states a plausible claim for relief will… be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [citation].  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'—'that the pleader is entitled to relief.' [citation]."  Ashcroft, supra, 556 U.S. at 678-679.

"In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft, supra, 556 U.S. at 679.

While plaintiffs' first amended complaint contains allegations concerning numerous incidents involving Rodger, plaintiffs' first amended complaint specifically relies upon six of those incidents in support of their claim that defendant had actual knowledge of Rodger's propensity for violence.

### 1.   Incident Of August of 2011 Between Rodger And His Hispanic Roommates

Plaintiffs allege that Rodger told the leasing manager everything that had happened concerning his confrontation with his two male Hispanic roommates in August of 2011. [¶ 22].

*Assuming arguendo* that defendant had actual knowledge of Rodger's insults, statements, and racial epithets in August of 2011 toward his two male Hispanic roommates, it did not put defendant on actual notice that Rodger had a propensity for later setting upon a violent rampage against roommates and strangers.

As to the allegations of racism, in <u>Andrews v. Mobile Aire Estates</u>, <u>125 Cal.App.4th 578</u> (2005), the court held that one tenant's harassing and annoying behavior toward another tenant, which included "using racial epithets and other verbal abuse" [<u>Andrews, supra</u>, 125 Cal.App.4th at 596], "did not make his battery of the neighbor sufficiently foreseeable for imposition of a tort duty; it did not 'put defendants on notice of [the assailant's] propensity for violence.' [citation]." <u>Andrews, supra</u>, 125 Cal.App.4th at 596.

Further, the propensity for violence in this incident was not demonstrated by Rodger, but by the Hispanic roommate who had to be restrained by the other Hispanic roommate.  [¶28].

Accordingly, the Court should determine that this roommate incident did not put defendant on actual notice that Rodger had a propensity for violence toward his roommates sufficient to support the imposition of a duty upon defendant to protect plaintiffs' decedents from Rodger's homicidal rampage.

### 2.   Incident In January of 2012 Between Rodger And Roommate Horowitz

Plaintiffs allege that in January of 2012, Horowitz and his father communicated to defendant, both in in-person meetings and through written correspondence, that Rodger was a threat and posed a danger to Horowitz.  [¶25].

1   *Assuming arguendo* that defendant had actual knowledge of Rodger's rage,

2   jealousy, and verbal abuse in January of 2012 toward Horowitz regarding the latter's

3   girlfriend [¶24], it did not put defendant on actual notice that Rodger had a

4   propensity for setting upon a violent rampage against roommates and strangers.

5   Andrews, supra, 125 Cal.App.4th at 596.

6       As to the allegation of jealous rages, Plaintiffs allege that in January of 2012,

7   after Rodger insulted Horowitz's girlfriend, Horowitz and Rodger "became hostile

8   towards each other and their roommate relationship became unworkable" [¶24], that

9   "Horowitz began to fear for his personal safety", "believed Rodger was mentally ill

10  and posed a 'threat' of violence", and that "Rodger was a threat and that he posed a

11  danger to Horowitz" [¶25].  *Assuming arguendo* these are sufficiently well-pled

12  factual allegations to assume the veracity thereof, necessitating a determination of

13  whether they plausibly give rise to an entitlement to relief [Ashcroft, supra, 556 U.S.

14  at 679], the question then arises whether the opinions expressed by Horowitz and his

15  father two and an half years prior to the incident, and while apparently seeking a

16  new living arrangement for Horowitz, plausibly give rise to an entitlement to relief

17  against defendant for Rodger killing Hong, Wang, and Chen.  The "context" of this

18  incident [Ashcroft, supra, 556 U.S. at 679] was a dispute between two male college

19  students (Rodger and Horowitz) where one had a female companion and the other

20  did not.  Judicial experience and common sense inform that the reasonably

21  foreseeable threat of violence was fisticuffs between Rodger and Horowitz; a city-

22  wide rampage commencing at the apartment leaving 6 people dead and 14 wounded

23  was not the threat reasonably to have been foreseen.  "[W]here the well-pleaded

24  facts do not permit the court to infer *more than the mere possibility of misconduct*,

25  the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

26  relief."  Ashcroft, supra, 556 U.S. at 679.

27      Accordingly, the Court should determine that this roommate incident between

28  Rodger and Horowitz did not put defendant on actual notice that Rodger had a

17

1  propensity for violence toward his roommates sufficient to support the imposition of

2  a duty upon defendant to protect plaintiffs' decedents from Rodger's homicidal

3  rampage.  Indeed, plaintiffs' allegations admit to a harmonious relationship with the

4  next set of roommates with whom Rodger was paired.  [¶ 28].

5                    **3.       Incidents of September 11, 2012 and July 20, 2013**

6         Plaintiffs allege on information and belief that the apartment manager (1)

7  "overheard" Rodger screaming for hours on end in his apartment on September 11,

8  2012, when he did not win a lottery jackpot drawing [¶ 26], and (2) "overheard"

9  Rodger crying and telling a neighbor at the Capri Apartments on July 20, 2013, "I'm

10  gonna kill all those motherf***kers and kill myself", after Rodger returned from the

11  party in Isla Vista.  [¶34].

12         "[D]istrict courts may properly consider allegations pled on information and

13  belief in determining whether claims have been adequately pled under Rule 8. That

14  an allegation is pled on information and belief is neither dispositive nor particularly

15  germane. Per Iqbal and Twombly, the proper inquiry remains whether the plaintiff

16  has presented a non-conclusory factual allegation."  Waldo v. Eli Lilly & Co., 2013

17  WL 5554623, 2013 U.S. Dist. LEXIS 145772, *15 (E.D. Cal. Oct. 7, 2013).

18         Plaintiffs have alleged no facts as to what the circumstances were which

19  support the conclusory allegations that (1) Rodger's screaming on September 11,

20  2012, was "overheard" by the apartment manager, and that (2) Rodger's

21  conversation with the neighbor on July 20, 2013, was "overheard" by the apartment

22  manager.  Without any such facts, plaintiffs have presented only their own

23  speculation as to what the apartment manager may have "overheard".

24         Even if the Court were to indulge the overhearing of these outbursts as well-

25  pleaded factual allegations, rather than conclusions, and assume their veracity, when

26  considered in their "context" [Ashcroft, supra, 556 U.S. at 679] they are insufficient

27  to give rise to the duty plaintiffs seek to impose.  What Rodger was heard screaming

28  over for hours on September 11, 2012, was a lost bet, not a roommate.  Even if

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1   extreme or protracted, such a tantrum does not render plausibly foreseeable Rodger's

2   homicidal rampage more than a year-and-a-half later.

3       As to Rodger's outburst on July 20, 2013, its "context" was Rodger crying in

4   frustration and shame after having been pushed off a balcony at one party, then

5   punched and kicked at another.  The anger being conveyed by Rodger is toward

6   people who literally almost killed him (whether he "deserved" it or not), not toward

7   roommates.  To the contrary, the "context" is that now back at home, Rodger was

8   crying to one of his neighbors, not threatening them.

9       Finally,  while Rodger's conduct in these incidents may have been unusual or

10  bizarre, it did not give defendant actual knowledge that this behavior would escalate

11  into a homicidal rampage.

12      "'Although the reported conduct of [the tenant] was perhaps disquieting…

13  none of it involved any physical violence or real threat to cause bodily harm…."

14  Davis, supra, 207 Cal.App.3d at p. 1404 (bracketed material added).

15  "'Consequently, while [the tenant's] conduct might have represented a common

16  nuisance, it does not follow that anyone should have foreseen the escalation of that

17  behavior into a fatal shooting.  The reality is that persons exhibiting similarly

18  "bizarre" behavior are to be seen on the streets of every major metropolitan

19  community.  Fortunately, few are ever actually dangerous.'"  Davis, supra, 207

20  Cal.App.3d at p. 1405 (emphasis added).

21      Accordingly, the Court cannot rely upon these bare allegations to determine

22  that defendant had actual notice that Rodger had a propensity for violence toward

23  his roommates sufficient to support the imposition of a duty upon defendant to

24  protect plaintiffs' decedents from Rodger's homicidal rampage.

25          **4.    Law Enforcement Visits Of January 15, 2014 and April 30,**

26              **2014**

27      Plaintiffs further allege on information and belief that (1) defendant was

28  "aware" that law enforcement officers had come to Apt. 7 on January 15, 2014, due

to a dispute between Rodger, Hong, and Wang [¶37], and that (2) defendant was "aware" that law enforcement officers had come to Apt. 7 on April 30, 2014, to conduct a welfare check on Rodger.  [¶40].

Once again, plaintiffs allege no facts demonstrating what the circumstances were to support the conclusory allegation that defendant was "aware" of the law enforcement visits on January 15, 2014 or on April 30, 2014.  Waldo v. Eli Lilly & Co., 2013 WL 5554623, 2013 U.S. Dist. LEXIS 145772, *15 (E.D. Cal. Oct. 7, 2013).  Plaintiffs only hope that such may be the case, rendering them merely conclusory.

*Assuming arguendo* that defendant was "aware" of these visits, the question is still begged as to what exactly these visits would have made defendant aware.

As to the law enforcement visit on January 15, 2014, the answer presumably is that defendant became "aware" that *Hong*, not Rodger, had been placed under arrest.  Defendant's awareness of this arrest would not be a reasonable basis to suspect Rodger was prone to a homicidal rampage.

As to the law enforcement visit on April 30, 2014, the answer presumably is that defendant became "aware" that the basis of the visit was to perform a welfare check, and further assumes that defendant was "aware" that the reason for the welfare check was a potential for violence toward others (as opposed to drug use, depression. or self-harm).  Accepting all of those assumptions *arguendo*, defendant would only have been aware that trained law-enforcement personnel concluded, after having been tasked with making the specific inquiry, that no evidence existed to support that Rodger posed any threat of harm to himself or others.   Thus, defendant's awareness of this welfare check would not be a reasonable basis to suspect Rodger was prone to a homicidal rampage.

Accordingly, the Court should determine that these incidents involving law enforcement did not put defendant on actual notice that Rodger had a propensity for violence toward his roommates sufficient to support the imposition of a duty upon

1 | defendant to protect plaintiffs' decedents from Rodgers' criminal acts.

2 | **V.     CONCLUSION**

3 | Holding an owner liable to a tenant for the criminal conduct of another tenant

4 | requires actual knowledge of facts making the crime foreseeable.  But plaintiffs do

5 | not allege that defendant had actual knowledge of recidivistic thievery, serial

6 | violence, or any other kind of criminal conduct from which further instances were

7 | plausibly to be expected.  While the recitations of plaintiff's first amended complaint

8 | attempt to create an unsettling chronology (even mining Rodger's secret Manifesto

9 | as though it had been public knowledge) as to this defendant, plaintiffs allege only

10 | six incidents to have been the source of its actual knowledge.  Neither separately nor

11 | collectively do these incidents constitute a bases to impose a legal duty upon

12 | defendant to foresee and protect against Rodger's violent break from reality.  Many

13 | parties had far greater familiarity with Rodger – mental health professionals, trained

14 | law enforcement, and plaintiffs' decedents themselves – and yet they did not foresee

15 | his rampage or they would have removed Rodger, or themselves, from the

16 | apartment.  Though their cause of action against defendant is styled as negligence,

17 | ultimately, plaintiffs seek to make this defendant strictly liable as the guarantor of

18 | the conduct of its tenants.  That, however, is not the law.  Plaintiffs implicitly

19 | recognize this absence of knowledge when they argue for a duty to diagnose and

20 | warn, i.e., to learn what is not presently known.  But a duty requiring owners to play

21 | mental health professional is manifestly unworkable as the case law recognizes, and

22 | would be terrible policy.  This defendant is not in any manner a wrongdoer in the

23 | circumstances at bar, and should be dismissed from this action.

24 | For the foregoing reasons, this Court should sustain defendant's motion to

25 | dismiss plaintiffs' first amended complaint.

26

27

28

1   DATED:  June 11, 2015          **MANNING & KASS**
                                   **ELLROD, RAMIREZ, TRESTER LLP**
2

3                                  By:  _____/s/ Eugene J. Egan_____
                                        Eugene J. Egan, Esq.
4                                       Attorneys for Defendant HI DESERT
                                        MOBILE HOME PARK LP (erroneously
5                                       sued as "CAPRI APARTMENTS AT ISLA
                                        VISTA")
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28