Patrick McNicholas – State Bar No. 125868
David Angeloff – State Bar No. 272929
MCNICHOLAS & MCNICHOLAS, LLP
10866 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
Tel:  (310) 474-1582
Fax:  (310) 475-7871

Todd Becker – State Bar. No. 127567
Todd A. Fuson – State Bar. No. 152593
BECKER LAW GROUP
3750 E. Anaheim Street, Suite 100
Long Beach, CA, 90804
Tel: (562) 495-1500
Fax: (562) 494-8904

Attorneys for Plaintiffs,
JUNAN CHEN, KELLY YAO WANG, CHANGSHUANG WANG,
JINSHUANG LIU, LICHU CHEN, and WENQUEI HONG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNAN CHEN, KELLY YAO WANG, CHANGSHUANG WANG, JINSHUANG LIU, LICHU CHEN, and WENQUEI HONG,<br><br>    Plaintiffs,<br><br>    -vs.-<br><br>COUNTY OF SANTA BARBARA; SANTA BARBARA COUNTY SHERIFF'S DEPARTMENT; CAPRI APARTMENTS AT ISLA VISTA; ASSET CAMPUS HOUSING; and | Case No.: 2:15-CV-01509-JFW (JEMx)<br>[Hon. John F. Walter]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT HI DESERT MOBILE HOME PARK L.P'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  July 13, 2015<br>Time: 1:30 p.m. |

DOES 1 through 200, Inclusive,

Defendants.

Ctrm: 16

Complaint Filed: March 2, 2015
Trial Date: April 26, 2016

COME NOW PLAINTIFFS, JUNAN CHEN, KELLY YAO WANG, CHANGSHUANG WANG, JINSHUANG LIU, LICHU CHEN, and WENQUEI HONG (hereinafter, "Plaintiffs") who hereby respectfully submit the below Memorandum of Points and Authorities in Opposition to the Motion to Dismiss brought by Defendant Hi Desert Mobile Home Park L.P. (hereinafter, "Defendant or "Capri").

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

I.    INTRODUCTION ....................................................................1

II.   SUMMARY OF ALLEGATIONS ................................................4

III.  LEGAL STANDARD ...............................................................8

IV.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED FACTS
      WHICH GIVE RISE TO A DUTY AS TO CAPRI AS A
      MATTER OF LAW ..................................................................9

      A.    Capri Assumed A Duty to Decedents Through Their
            Affirmative Undertaking To Pair Hong And Wang As
            Roommates With Roger, Which Created A Special
            Relationship .................................................................9

      B.    Even Absent Any Assumed Duty, Capri Owed A Duty To
            Decedents Because A Special Relationship Existed, Capri Had
            Actual Knowledge That Specific Third-Party Conduct Was
            Likely To Occur, And There Were Specific, Minimally
            Burdensome Measures Capri Should Have Performed To
            Prevent The Harm .........................................................11

      C.    Capri Had Actual Knowledge That Rodger Posed A Specific
            "Threat" And Was A "Danger" To His Roommates ............13

      D.    There Were Specific Measures Which Plaintiffs Claim
            Should Have Been Performed By Defendant ....................17

      E.    The Burden Placed On Defendant To Undertake These
            Measures Was Minimal .................................................18

      F.    Rodger's Violent Attack On Decedents Was Foreseeable
            And Consistent With The Warnings That Had Been Previously
            Given to Capri .............................................................21

1

V.     PLAINTIFFS NOW KNOW THE TEXT OF THE LETTER,
       AND CAN AMEND THE COMPLAINT WITH SPECIFIC
       LANGUAGE..............................................................................24

VI.    CONCLUSION ...........................................................................24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

Active Disposal Inc. v. City of Darien, 635 F.3rd 883 (7th Cir. 2011) ......................9

Ashcroft v. Iqbl, 556 U.S. 662 (2009) ...................................................................9

Erickson v. Pardus, 551 U.S. 89 (2007) ...............................................................9

Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184 (1993) ...............................13, 14

Munson v. Gaetz, 673 F.3rd 630 (7th Cir. 2012)....................................................9

**STATE CASES**

Ann M., 6 Cal. 4th 666 (1993)...........................................................................21

Ballard v. Uribe, 41 Cal.3d 564 (1986) .............................................................23

Barber v. Chang, 151 Cal.App.4th 1456 (2007)..................................................14

Castaneda v. Olsher, 41 Cal.4th 1205 (2007) ...............................................12, 13

Davis v. Gomez, 207 Cal.App.3d 1401 (1989) .............................................19, 20

Delgado v. Trax Bar & Grill, 36 Cal.4th 224 (2005) .......................................9, 10

Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112 (1985)...............12, 16, 22

Kwaitkowski v. Superior Trading Co., 123 Cal.App.3d 324 (1981)......................12

Margaret W. v. Kelley R., 139 Cal.App.4th 141 (2006) ..................................14, 15

Onciano v. Golden Palace Restaurant, Inc., 219 Cal.App.3d 385..........................22

Schwartz v. Helms Bakery, Ltd., 67 Cal.2d 232 (1967).......................................10

Valdez v. Taylor Auto Co., 129 Cal.App.2d 810 (1954) ......................................10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Despite that fact that defendant HI DESERT MOBILE HOME PARK ("Capri") had been specifically informed that their tenant Elliot Rodger ("Rodger") posed a serious threat of violence to any roommates he was paired with, and despite the fact that Capri was aware of numerous incidents which indicated Rodger was an unsuitable and unstable roommate, Defendant Capri affirmatively undertook to assign and pair Rodger as roommate with decedents Weihan "David" Wang (hereinafter "Wang") and Cheng-Yuan "James" Hong ("Hong"). Capri undertook to pair Rodger and the decedents as roommates for a commercial purpose, and the decedents relied on Capri and trusted that Capri had paired them with a safe and appropriate roommate. Capri, in pairing the Rodger and decedents Hong and Wang as roommates, failed to take even the simplest measures, i.e. warning or informing the decedents and/or their parents of what they had been told about Rodger by Rodger's former roommate. Capri further failed to exercise any of the many other options available to them at the time to keep their tenants safe. Instead, defendant Capri took the path of no action, which served their financial interest at increased risk to their tenants, and ultimately Hong, Wang, and their guest, George Chen ("Chen") were stabbed and killed by Rodger inside their apartment.

/ / /

Plaintiffs do not allege that Defendant Capri had some unlimited duty to protect their sons, the decedents, from the criminal acts of the entire world. Plaintiffs allege that Defendant Capri, in <u>undertaking to pair the decedents together with Elliot Rodger for a commercial purpose</u>, and by placing them as roommates within the four walls of a dwelling together, <u>assumed</u> and therefore owed them a <u>specific and reasonable minimum duty</u> to warn and protect them from a specific threat of violence. That threat was that Rodger "was a threat and that he posed a danger," which Capri was informed of as early as January of 2012.

Defendant misstates the measures Plaintiffs allege should have been taken and further misstates the "burden" which would be imposed. Plaintiffs in no way assert that a landlord should "diagnose" mental health issues or have to hire professionals to screen their tenants. Plaintiffs are instead focused on the duty to take reasonable, minimal action based on a known likelihood or propensity for violence. In the instant case, Capri was specifically put on notice that Rodger was a "threat" and "posed a danger" to his roommates. When a landlord is handed a letter containing an unambiguous warning of violence, there is nothing to "diagnose," the landlord is on notice. Rodger's known propensity for violence towards his roommates is what is at issue, regardless of the underlying cause, had it be mental illness, criminal motive, desire for revenge, or any other potential reason. To conflate this issue with diagnosing and discriminating against mental illness is misleading and inaccurate.

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

The "burden" Plaintiffs would impose is, at its most basic, virtually *de minimis*: a simple warning. A landlord informing or warning a tenant whom the landlord is undertaking to pair as a roommate, whether verbally, via email, or via letter, that they had been told about a specific threat of violence concerning the would-be roommate, would cost nothing (or next to nothing), could be delivered by existing property management personnel quickly and discreetly, and make the now-informed tenants fully able to determine whether to accept that risk, demand a change, or take any other action they see fit to keep themselves safe. Further, that is merely the floor of the list of options available to the landlord. The landlord could choose to investigate to determine what needs to be disclosed to the would-be roommates, if anything, in order to keep them safe. Further, the landlord, in addition to or as a substitute for the warning, in its business discretion, could choose to only assign a tenant like Rodger to his own unit, could choose to refuse to renew such a tenant's lease when it expired, or could choose to evict such a tenant, among other options.

Finally, Defendant Capri misstates Plaintiffs' allegations with respect to "actual knowledge." Plaintiffs allege that Capri had "actual knowledge" that Rodger posed a threat of violence to his roommates based on specific communications sent by a former roommate of Rodger to Defendant Capri, including a letter, which unequivocally informed Defendant that Rodger was a threat and posed a danger to

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

the roommate. The rest of the "six incidents" that Defendant refers to all provide context and confirmation which should have served to heighten the seriousness of the specific warning Capri was given. Plaintiffs do not allege that some vague constellation of incidents led to "actual knowledge," Plaintiffs allege that a specific letter containing a specific warning led to actual knowledge of Rodger's propensity for violence toward those he was roommates with, and the other five incidents served to add credibility and gravity to that warning.

For the foregoing reasons, this Court should deny Defendant Capri's motion to dismiss Plaintiffs' complaint.

## II.   SUMMARY OF ALLEGATIONS

Defendant Capri's summary of the allegations in Plaintiffs' first amended complaint is accurate, however some critical aspects of the allegations, specifically Capri's affirmative undertaking of pairing the roommates, were left out.

Defendant CAPRI operates a large commercial student housing property in Isla Vista that primarily services students of the University of Santa Barbara and Santa Barbara City College. [¶20]

On June 4, 2011, Rodger moved to Isla Vista and Defendant paired Rodger with two roommates to live with in Apt. #7 in the main Capri complex on Seville

/ / /

/ / /

Road. [¶21].[1] In August of 2011, Capri assigned two new roommates, both male Hispanics, to be Rodger's roommates in Apt. #7. [¶22]. Within days of them moving in, Rodger instigated a serious conflict between himself and his new roommates. [¶22]. Rodger went to Defendant's leasing manager and explained everything that had happened. [¶22]. Shortly thereafter, Rodger signed a lease for another, larger apartment. [¶22].

In September of 2011, Rodger moved into his new apartment and Capri assigned Spencer Horowitz ("Horowitz") as his roommate. [¶23]. Within a few months, Rodger again initiated significant conflict between himself and his roommate, and the roommates became hostile towards each other and their roommate relationship became unworkable. [¶24].

On information and belief, Plaintiffs allege that in January of 2012, Horowitz began to fear for his personal safety. Horowitz informed his father that he believed Rodger to be mentally ill and posed a threat of violence. [¶25]. Horowitz and his father began taking action to remove Horowitz from his living situation due to the danger posed by Rodger. [¶25]. Horowitz and his father communicated to Capri, both in in-person meetings and through written correspondence, that Rodger was a threat and posed a danger to Horowitz. [¶25]. Horowitz and his father eventually arranged for Horowitz to move out of the apartment and find other living

---

[1] All subsequent bracketed references will be to Plaintiffs' first amended complaint

accommodations. [¶25].

On September 11, 2012, Rodger "threw a wild tantrum, screaming and crying for hours on end" all the while thrashing the furniture with a wooden practice sword. [¶27]. On information and belief plaintiffs allege that Rodger's screaming was overheard by Rodger's neighbors and the apartment manager. [¶27].

In September 2012, Capri transferred Rodger back to Apt. #7 on Seville Road. [¶28]. Rodger later wrote "I trusted that the manager had the sense to pair me with mature people, knowing my experiences with those two barbaric housemates I had to deal with a year previously." [¶28]. After about a month (October of 2012), CAPRI assigned Rodger two new roommates, whom he described as "timid geeks" who were "quiet, respectful and friendly." [¶28].

In April of 2013, Rodger posted hateful, angry, deeply misogynist and racist material under his own name on various websites. [¶32]. Virtually all of the content Rodger had posted online was easily discoverable with simple Google searches of his name. [¶32].

On July 20, 2013, Rodger went to a party in Isla Vista in an intoxicated state. [¶34]. He became angry at a group of girls whom he believed were ignoring him, and tried to push some of them off a ledge. [¶34]. A group of male students intervened and pushed Rodger off the ledge, breaking his ankle. [¶34] As he stumbled away

filed on May 20, 2015 (Docket No. 35) unless otherwise noted.

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

from the party, Rodger realized that he had lost his Gucci sunglasses during the altercation. [¶34]. Rodger went to the wrong house and demanded his sunglasses back. [¶34]. The occupants of this house called Rodger names and began kicking and punching him. [¶34]. Rodger left this house and fled the area. [¶34]. Rodger returned home bruised, disheveled and crying, and told a neighbor at the Capri Apartments "I'm gonna kill all those motherf***kers and kill myself." [¶34]. Plaintiffs allege on information and belief that this conversation was overheard by Rodger's neighbors and the apartment manager. [¶34].

In September of 2013, after surgery on his ankle and following a period of recuperation at his mother's house, Rodger returned to Apt. 7. [¶36]. During this time, Capri affirmatively undertook to pair Hong, Wang, and Rodger as roommates, in Apt. #7, despite the fact that CAPRI had been warned that Rodger was a violent and dangerous threat. [¶36]. Hong and Wang reasonably relied on Capri's undertaking to pair and assign them a roommate. [¶36]. Capri made no disclosure regarding Rodger and gave Hong and Wang no warning of any kind that Rodger had had serious conflicts with his previous roommates and that CAPRI had been warned that he posed violent and dangerous threat to his roommates. [¶36].

On January 15, 2014, Rodger placed Hong under citizen's arrest related to a dispute over pots and candles and called the SBCSD. [¶37]. After the deputies arrived at Apt. #7 and interviewed all parties, they arrested Hong for an infraction

(petty theft). [¶37] This charge against Hong was ultimately dismissed due to insufficient evidence. [¶37]. Plaintiffs allege on information and belief that defendant was aware that law enforcement officer had come to Apt. #7 due to a dispute between Rodger and his roommates. [¶37].

In April of 2014, Rodger uploaded numerous videos to YouTube expressing his jealousy and rage toward women, minorities, and sexually active people. [¶39].

On April 30, 2014, SBCSD visited Rodger for a "wellness check" in response to a call by a mental health worker who had seen Rodger's online content. [¶40]. The deputies spoke to Rodger at the doorstep of the apartment but did not ask to enter the apartment or search his room. [¶40]. They left after Rodger told them that it was a misunderstanding. [¶40]. Plaintiffs allege on information and belief that defendant was aware that law enforcement had come to Apt. #7 to conduct a welfare check on Rodger. [¶40].

On May 23, 2014, Rodger killed Hong and Wang, and their visiting friend Chen, with knives and other weapons inside Apt. #7. [¶41]. Rodger then headed out into Isla Vista to carry out a shooting rampage that left three more people dead and fourteen wounded. [¶41].

## III.   LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the ... claim is and the grounds upon which it

rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007). In reviewing the sufficiency of a complaint, the Court must accept all well-pleaded facts as true and *draw all permissible inferences in favor of the plaintiff.* Active Disposal Inc. v. City of Darien, 635 F.3rd 883, 886 (7th Cir.2011) (emphasis added).

A motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009). According to the court, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Munson v. Gaetz, 673 F.3rd 630, 633 (7th Cir.2012).

**IV.  PLAINTIFFS  HAVE  SUFFICIENTLY  PLEADED  FACTS  WHICH GIVE RISE TO A DUTY AS TO CAPRI AS A MATTER OF LAW**

**A.    Capri Assumed A Duty To Decedents Through Their Affirmative Undertaking To Pair Hong And Wang As Roommates With Rodger, Which Created A Special Relationship**

A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a "special relationship" with the other person. Delgado v. Trax Bar & Grill, 36 Cal. 4th 224, 234 (2005). "Liability may be imposed

on a person who has no general duty to act, but who has voluntarily assumed a

protective duty toward an individual and undertakes action on his or her behalf,

thereby inducing reliance" <u>Schwartz v. Helms Bakery Ltd.,</u> 67 Cal.2d 232, 238

(1967).

"It is well established that a person may become liable in tort for negligently

failing to perform a voluntarily assumed undertaking even in the absence of a

contract so to do. A person may not be required to perform a service for another but

he may undertake to do so—called a voluntary undertaking. In such a case the person

undertaking to perform the service is under a duty to exercise due care in performing

the voluntarily assumed duty, and a failure to exercise due care is negligence. Dean

Prosser says, '[I]f the defendant enters upon an affirmative course of conduct

affecting the interests of another, he is regarded as assuming a duty to act, and will

thereafter be liable for negligent acts or omissions,'" <u>Valdez v. Taylor Auto. Co.,</u>

129 Cal.App.2d 810, 817 (1954). The extent of a landlord's duty in these

circumstances is also framed by the "negligent undertaking" (or Good Samaritan)

doctrine: One who, having no initial duty to do so, voluntarily undertakes to provide

another with protective services has a duty to exercise due care in performing that

undertaking if either (i) the failure to exercise due care increases the risk of harm to

the other person or (ii) the other person reasonably relies upon that undertaking and

suffers injury as a result. <u>See Delgado, supra</u>, 36 Cal. 4th 224 at pg. 249.

In the instant case, Capri's affirmative action of pairing the roommates together assumed an even higher level of duty (and a lower level of needed foreseeability) than existed by virtue of the landlord-tenant relationship alone. Defendant Capri's moving papers largely ignore this assumption of duty. It is undisputed that Hong and Wang did not know Rodger and did not request to be paired with Rodger. It is further undisputed that Defendant chose and otherwise selected Rodger to be paired with Hong and Wang to further the commercial interest of running their student housing enterprise. Hong and Wang submitted to Capri's roommate pairing process and relied on Capri to pair them appropriately and safely, which Capri did not do. By virtue of Capri's affirmative act, Capri assumed a duty, which included at a minimum warning or informing the decedents of what they had been told about Rodger by Horowitz.

**B.      Even Absent Any Assumed Duty, Capri Owed A Duty To Decedents Because A Special Relationship Existed, Capri Had Actual Knowledge That Specific Third-Party Violence Was Likely To Occur, And There Were Specific, Minimally Burdensome Measures Capri Should Have Performed To Prevent The Harm**

"A landlord generally owes a tenant the duty, arising out of their special relationship, to take reasonable measures to secure areas under the landlord's control against foreseeable criminal acts of third parties. [citations]. In each case...the

existence and scope of a property owner's duty to protect against third party crime is a question of law for the court to resolve. [citations]." Castaneda v. Olsher, 41 Cal.4th 1205, 1213 (2007).

"[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required. [Citation.] We recently reaffirmed this analysis, which we described as a "sliding-scale balancing formula." Castaneda, supra, 41 Cal. 4th 1205 at pg. 1213.

Further, foreseeability turns on a totality of the circumstances analysis. As the California Supreme Court held in *Isaacson v. Huntington Memorial Hospital*: "[f]oreseeability does not require prior identical or even similar events." The court reasoned that "[w]hether a given criminal act is within the class of injuries which is reasonably foreseeable depends on the totality of the circumstances and not on arbitrary distinctions ...." Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112, 127 (1985) citing Kwaitkowski v. Superior Trading Co.,123 Cal.App.3d 324, 329 (1981).

"The duty analysis…requires the court in each case (whether trial or appellate) to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake…. 'First, the court must determine the specific measures the plaintiff

asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur." Castaneda, supra, 41 Cal. 4th 1205 at pg. 1214.

**C.     Capri Had Actual Knowledge That Rodger Posed A Specific "Threat" And Was A "Danger" To His Roommates**

Capri was warned by their tenant Horowitz that Rodger was "a threat" and posed "a danger" to his roommates. As set forth in Paragraph 25 of Plaintiffs' First Amended Complaint "Horowitz and his father communicated to CAPRI and ASSET, both in in-person meetings and through written correspondence that Rodger was a threat and that he posed a danger to Horowitz." [¶27] Defendants concede this communication was pleaded by Plaintiffs. "[T]he court should take the well-pleaded facts as they appear in the complaint and extend to the claimant every reasonable inference which is in his or her favor." See Pihl v. Massachusetts Dep't of Educ., 9

1  F.3d 184, 187 (1993).

2      The Merriam-Webster dictionary definition of "danger" includes the following

3

4  meanings: "the possibility that you will be hurt or killed," and; "a person or thing

5  that is likely to cause injury, pain, harm, or loss." This warning, given to Capri,

6  unambiguously informed Capri that Rodger was reasonably likely to take violent

7

8  action, potentially including the violent stabbing that ultimately occurred, against

9  any roommate he was paired with.

10      "[W]hen the third party crime is committed by a tenant, foreseeability turns on

11

12  whether the landlord had "notice of [the tenant's] propensity for violence.

13  [citations]." Barber v. Chang, 151 Cal. App. 4th 1456, 1464 (2007). '[I]n cases

14  where the burden of preventing future harm is great, a high degree of foreseeability

15

16  may be required. [Citation.] On the other hand, in cases where there are strong policy

17  reasons for preventing the harm, or the harm can be prevented by simple means, a

18  lesser degree of foreseeability may be required.' " Barber, supra, 151 Cal. App. 4th

19

20  1456 at pg. 1464.

21      "[N]o matter whether a heightened or lesser degree of foreseeability was

22

23  required and no matter whether the actual crime committed or only similar conduct

24  needed to be foreseen—foreseeability must be measured by what the defendant

25  actually knew." Margaret W. v. Kelley R., 139 Cal. App. 4th 141, 156 (2006).

26

27  Plaintiffs easily satisfy this burden, the Defendant was literally handed "actual

28

---

14

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

notice" in the form of a letter. In <u>Margaret W.</u>, a fifteen-year old plaintiff endured a brutal sexual assault when she left a sleepover at her girlfriend's house with boys in a drunken state. The plaintiff in that case brought a negligence action against the mother who had hosted the sleepover. The plaintiff's allegations that the acts were foreseeable were based <u>solely</u> on constructive knowledge or information the plaintiff alleged the defendant mother should have known. <u>See Margaret W., supra</u>, 139 Cal. App. 4th 141 at pg. 145. The instant case is a completely different scenario due to the letter and specific warning as well as the affirmative undertaking to "pair" the roommates by Capri which assumed a minimum duty to "pair" them reasonably.

With respect to the other incidents which Defendant Capri was aware of which made the violence foreseeable (Rodger's August 2011 conflict with his Hispanic roommates [¶22]; the "screaming" and "thrashing" incident [¶27]; the "I'm gonna kill all those motherf***kers" incident [¶34]; the law enforcement visit of January 15, 2014, [¶37] and; the law enforcement visit of April 30, 2014 [¶40]), these instances primarily serve to add gravity and credibility to the warning letter written by Horowitz and highlight Rodger's non-suitability as a roommate in the context of that warning.

Plaintiffs have pleaded that Capri had an "apartment manager" on site. [¶27]. Plaintiffs allege that Defendant Capri had actual knowledge of the incidents above based on the day and night presence of that manager. Unlike other apartments where

there is no landlord (or agent of the landlord) present to monitor what is happening on site, Defendant Capri actually had someone doing just that. Defendant Capri, through its apartment manager, had actual knowledge of not only the letter which warned that Rodger was a "danger" and a "threat," but the "reasonable inference" can be drawn that the manager overheard or otherwise had knowledge of Rodger's screaming and thrashing, overheard or otherwise had knowledge of the "kill those motherf***kers" threat made in the courtyard, and that law enforcement officers had entered the property and gone to Apartment #7 on two occasions. Viewing every reasonable inference in favour of the Plaintiff, each of these incidents were known by Defendant Capri, and yet recklessly ignored.

However, even if none of these "other" instances had occurred at all, the letter could stand on its own as direct, specific, actual knowledge that Rodger posed a threat. When the other instances are added to that letter of warning, the threat of violent harm is made even more foreseeable. Because the analysis of foreseeability is a "totality of the circumstances" analysis, per Isaacs, these other instances are relevant and go to the "totality" of the foreseeability of Rodger's violent acts. Isaacs, supra, 38 Cal.3d 112 at pg. 130.

/ / /

/ / /

/ / /

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

**D.     There Were Specific Measures Which Plaintiffs Claim Should Have Been Performed By Defendant**

Defendant misstates what measures Plaintiffs allege should have been taken. Plaintiffs allege that, <u>at a reasonable minimum, Defendant Capri should have informed or warned Hong and Wang about the threat posed by Rodger</u>, nothing more. Plaintiff offers additional specific measures as options which, in Defendant's business discretion, could have been taken in addition to, as a supplement to, or instead of warning or informing the decedents. This is important because the "burden" discussion must be framed around the <u>minimum</u> duty of warning, and also because the additional "optional" measures actually make it easier for Defendant to comply – within their discretion if any other options are more appealing or less burdensome than the "warning" option, they could take that option instead.

Plaintiffs allege that the following specific measures could and should have been performed by Defendant, in ascending order of burden: (1) Simply communicate to Hong and Wang that Capri had been informed that Rodger "was a threat" and "posed a danger" to one of his former roommates [¶¶ 36, 53, 56]; (2) investigate Rodger to be better informed about his suitability as a roommate and tenant, and to better judge the credibility of the warning given by Horowitz, in order to determine what other actions must be taken (this could include simple internet searches or checks of social media – cost free to the Defendant) [¶¶ 36 and 56]; (3)

arrange for Rodger to remain a tenant, but to decline to pair him with other

roommates; (4) let Rodger's lease expire and decline to extend or continue his

tenancy, and; (5) to evict Rodger. [¶¶ 36, 53, 56].

**E.     The Burden Placed On Defendant To Undertake These Measures Was Minimal**

Defendant radically misstates the "burden" Plaintiffs would impose on

Defendant – a simple email, letter, note, or conversation could have been directed to

the decedents about the warnings Capri had received about their new roommate (or

roommate-to-be). This "warning" would have been, if not completely cost-free,

virtually cost-free (the cost of stationary and postage), could have been easily carried

out by existing employees (property management personnel), and would have taken

taken *de minimis* time and labor to perform. Defendant's arguments regarding the

burdens associated with diagnosing and disclosing mental illness and discriminating

on the basis of disability are not relevant, as Plaintiffs have not alleged that

Defendant has any duty to take those actions.

Defendant also totally misstates the alleged "burden" with respect to any

diagnosis of mental illness. Defendant's moving papers conflate "mental illness" and

likelihood to commit violence as one in the same. In the instant case, Rodger was

dangerous and posed a "threat" due to the fact he was mentally ill. However, the

important fact is <u>that he was dangerous and posed a threat</u>, not <u>why</u> he was

dangerous and posed a threat. Defendant Capri was in a good position and on equal footing with every other commercial enterprise in terms of its ability to make reasonable and common sense determinations of whether or not someone poses a threat of violence. This is doubly clear under the instant facts, where Capri was handed a letter which notified them as such.

The instant case is critically distinguishable from the Davis case cited by the Defendant. Plaintiffs do not allege that Capri was warned Rodger was "losing his mind," Capri was warned that Rodger was "dangerous." In Davis a mentally ill tenant shot another tenant, who lived in a different unit, as he walked by her door. The landlord in that case, knew (or had been informed) that the shooter, a Ms. Townsend, was "losing her mind" and her mental condition was "deteriorating." The landlord also was informed that Ms. Townsend was exhibiting bizarre behavior such as talking to herself and "casting spells" on tenants as they walked by. Davis v. Gomez, 207 Cal. App. 3d 1401, 1403 (1989).

As a threshold matter, the facts in the instant case are completely different because of the affirmative pairing of the roommates in a single unit by Capri, who in doing so, assumed a duty to perform that pairing reasonably. That assumed duty all but obviates the need for further duty analysis, however, Plaintiffs have still pleaded facts sufficiently different from the Davis case to establish duty regardless.

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

The Davis case dealt with tenants from separate units, in the instant case the decedents were affirmatively selected to live within the same four walls as Rodger. The Davis Plaintiffs alleged that notice of Ms. Townsend's bizarre behavior alone was enough to establish foreseeability and therefore duty, in the instant case, Plaintiffs allege Defendant had actual notice and was specifically notified that Rodger "was a threat" and "posed a danger." Finally, the Davis Plaintiffs failed to establish what action the landlord could have taken that would have made a difference, in the instant case, Plaintiffs have set forth specific, detailed, and minimally burdensome actions that Defendants could have taken to protect their tenants. See Davis, supra, 207 Cal.App.3d 1401 at pg. 1406.

Even if Plaintiffs were alleging that the burden on the Defendant had included evicting Rodger, Davis supports the proposition that, when information regarding a serious threat arises, a duty to evict can be appropriately found. "Under circumstances of the present variety, the landlord is often caught in the middle of competing tenant interests, and stands at risk no matter what course of action is decided upon. It is usually a classic 'no win' situation. Yet, if it were reasonably foreseeable that an innocent tenant might be killed, the possibility of legal action by the evicted tenant obviously becomes of subordinate concern." Davis, supra, 207 Cal.App.3d 1401 at pg. 1404.

/ / /

Similarly, in <u>Barber v. Chang, supra</u>, 151 Cal.App.4th at pg. 1468, the Court referenced the Supreme Court's <u>Ann M.</u> decision and observed that a landlord's duty "may include investigating the incident to determine whether to evict the potentially violent tenant, threatening to evict the tenant, or invoking the aid of police on a credible report of a brandishing crime committed by one tenant against another." <u>See</u> <u>Ann M.</u> 6 Cal.4th 666, 679 (1993).

**F.     Rodger's Violent Attack On Decedents Was Foreseeable And Consistent With The Warnings That Had Been Previously Given To Capri**

Plaintiffs do not allege that Capri had a duty to predict that Rodger would walk out the door and commit a rampage <u>after</u> killing Hong, Wang, and Chen. Plaintiffs only allege, importantly, that the violence that took place behind the closed door of Apartment #7 was foreseeable based on the totality of the circumstances that Capri was aware of. [¶ 52]. The specific warning that Rodger was "a threat" and posed "a danger," supported by the other incidents that Capri was aware of, made it reasonably foreseeable that physical violence, including stabbing, was reasonably likely to occur to anyone Rodger was paired with.

The Supreme Court of California has held: "While prior similar incidents are helpful to determine foreseeability, they are not required to establish it. Other circumstances may also place the landowner on notice of a dangerous condition. A rule which limits proof of foreseeability to evidence of prior similar incidents

automatically precludes recovery to first-injured victims. Such a rule is inherently unfair and contrary to public policy." <u>Isaacs, supra</u>, 38 Cal.3d 112, 135. Simply put, there is no "one free attack" rule under California law.

"Foreseeability 'is not to be measured by what is more probable than not, *but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.* [Citation.]' Thus, in determining the existence of a landowner's duty to protect invitees from the wrongful conduct of third persons, foreseeability is measured by all of the circumstances including the nature, condition and location of the defendant's premises and defendant's prior experience, bearing in mind that what is required to be foreseeable is the general nature of the event or harm, not its precise nature or manner of occurrence." <u>Onciano v. Golden Palace Restaurant, Inc.</u>, 219 Cal. App. 3d 385, 392 (emphasis added).

The general nature of the foreseeable event or harm was physical violence committed by Rodger upon one of his roommates. That harm (stabbing) could have been prevented by simple means (a simple warning to the tenants about Rodger). Using the "sliding scale analysis" under <u>Castaneda</u>, even if the facts did not give rise to "heightened foreseeability," even "lesser foreseeability" could be sufficient under the circumstances.

///

Finally, Plaintiffs allegations pass the test set forth in <u>Ballard</u>, as referenced in the Defendant's moving papers. The "court's task -- in determining 'duty' -- is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." <u>Ballard v. Uribe</u>, 41 Cal.3d 564, 572, n. 6 (1986). The harm that occurred to the decedents was <u>stabbing</u>, regardless of what occurred after Rodger walked out the door of Apartment #7 after killing his roommates and their guest. The foreseeability analysis must turn on what happened <u>to the decedents</u>. Defendant Capri was warned and informed that Rodger posed a threat of violence and Capri took no action to warn or inform the young men they had affirmatively undertaken to pair as Rodger's roommates. With respect to finding duty, the negligent conduct at hand, failure to warn and protect tenants from a known violent danger, is likely to result in exactly the "kind of harm" which occurred – stabbing. Further, this duty analysis does not even take into account the heightened duty which Capri assumed through its affirmative undertaking of pairing Roger and the decedents together, which the decedents detrimentally relied on.

/ / /

/ / /

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

## V.   PLAINTIFFS NOW KNOW THE TEXT OF THE LETTER, AND CAN AMEND THE COMPLAINT WITH SPECIFIC LANGUAGE

Since the filing of Plaintiffs' First Amended Complaint on May 20, 2015, Plaintiffs have obtained a copy of the letter given to Defendants by Horowitz. Although Plaintiffs believe that the description of the letter, as pleaded, is sufficient to establish actual notice of a violent threat given to Defendant, Plaintiffs are now able to amend their First Amended Complaint to include the specific language of the warning of violence if necessary.

## VI.   CONCLUSION

Plaintiffs' First Amended Complaint has sufficiently pleaded and alleged facts which give rise to a duty on the part of Capri. Defendant Capri, in affirmatively undertaking to pair decedents Hong and Wang together with Elliot Rodger, and placing them as roommates within the four walls of Apartment #7, assumed a duty to perform that pairing reasonably and to take reasonable minimum steps to protect the decedents from foreseeable harm. Further, even in the absence of such assumption of a duty, because the Defendant had a special relationship with decedents, and because they had been warned and given specific, actual knowledge that Rodger "was a threat and that he posed a danger" to a former roommate, Capri had a duty to take, at a minimum, the reasonable and minimally burdensome act of warning or otherwise informing the decedents of that danger. Plaintiffs in no way have alleged that Capri

had a duty to diagnose mental illness or discriminate against it. Plaintiffs have alleged, however, that when a landlord is specifically informed that a tenant poses a reasonably likely threat of violence, regardless of the reason that person poses such a threat (be it mental illness or any other cause), that the landlord has a reasonable minimum duty to warn other tenants that are directly exposed to that threat, particularly when the landlord is engaged in affirmatively pairing roommates together.

For the foregoing reasons, Defendant Capri's Motion to Dismiss Plaintiffs' First Amended Complaint should be denied.

Dated:  June 22, 2015.                              McNICHOLAS & McNICHOLAS, LLP

                                                    BECKER LAW GROUP


                                                    By:   /s/ Patrick McNicholas
                                                          Patrick McNicholas
                                                          David Angeloff
                                                          Attorneys for Plaintiffs,
                                                          JUNAN CHEN, KELLY YAO WANG,
                                                          CHANGSHUANG WANG,
                                                          JINSHUANG LIU, LICHU CHEN, and
                                                          WENQUEI HONG

Plaintiffs' Opposition to Defendant Capri's Motion to Dismiss

## DECLARATION OF SERVICE BY MAIL

I am a citizen of the United States and a resident of Los Angeles County. I am over the age of eighteen years and not a party to the within entitled action; my business address is 10866 Wilshire Boulevard, Suite 1400, Los Angeles, CA.

On June 22, 2015, I served a true copy of the within [DOC NAME] on the interested parties in this action by:

X      electronic transmission via CM/ECF to the persons indicated below:

Mary Pat Barry
Senior Deputy County Counsel
County of Santa Barbara
105 E. Anapamu Street
Suite 201
Santa Barbara, CA 93101
*Attorneys for County of Santa Barbara and*
*Santa Barbara County Sheriff's Department*

Eugene J. Egan, Esq.
Christopher A. Kanjo, Esq.
Manning & Kass
801 S. Figueroa Street, 15th Floor
Los Angeles, CA 90017
*Attorneys for Hi Desert Mobile Home Park LP (erroneously*
*Sued as "Capri Apartments at Isla Vista")*

William S. Kronenberg, Esq.
Kronenberg Law, P.C.
1999 Harrison Street
Suite 1450
Oakland, CA 94612
*Attorneys for Asset Campus Housing, Inc.*

X      (Federal) I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on June 22, 2015, at Los Angeles, California

/s/Millie A. Capellan
Millie A. Capellan