1  Eugene J. Egan (State Bar No. 130108)
    *eje@manningllp.com*
2  Christopher A. Kanjo (State Bar No. 128015)
    *cak@manningllp.com*
3  **MANNING & KASS**
    **ELLROD, RAMIREZ, TRESTER LLP**
4  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
5  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
6
   Attorneys for Defendant HI DESERT
7  MOBILE HOME PARK LP (erroneously
   sued as "CAPRI APARTMENTS AT
8  ISLA VISTA")

9              **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  JUNAN CHEN, KELLY YAO WANG,          Case No. 2:15-CV-01509- JFW (JEMx)
    CHANGSHUANG WANG,                    [The Hon. John F. Walter]
13  JINSHUANG LIU, LICHU CHEN, and
    WENQUEI HONG,
14                                       **REPLY OF DEFENDANT HI**
                                         **DESERT MOBILE HOME PARK**
15          Plaintiffs,                  **L.P. TO PLAINTIFFS'**
                                         **OPPOSITION TO MOTION TO**
16          v.                           **DISMISS FIRST AMENDED**
                                         **COMPLAINT FILED MAY 20, 2015;**
17  COUNTY OF SANTA BARBARA;             **MEMORANDUM OF POINTS AND**
    SANTA BARBARA COUNTY                 **AUTHORITIES IN SUPPORT**
18  SHERIFF'S DEPARTMENT; CAPRI
    APARTMENTS AT ISLA VISTA;
19  ASSET CAMPUS HOUSING, and            Date:  July 13, 2015
    DOES 1 through 200, Inclusive,       Time: 1:30 p.m.
20                                       Ctrm, 16
            Defendants.
21                                       Trial Date:  April 26, 2016

22  TO PLAINTIFFS JUNAN CHEN, KELLY YAO WANG, HANGSHUANG

23  WANG, JINSHUANG LIU, LICHU CHEN, AND WENQUEI HONG, AND TO

24  THEIR ATTORNEYS OF RECORD HEREIN:

25          Defendant HI DESERT MOBILE HOME PARK LP (erroneously sued as

26  "CAPRI APARTMENTS AT ISLA VISTA") ("Capri") submits the following reply

27  to "Plaintiffs' Opposition to Defendant Hi Desert Mobile Home Park L.P.'s Motion

28  To Dismiss Plaintiffs' First Amended Complaint, etc." filed on June 22, 2015.

                                    1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................... 1

II. RESPONSE TO PLAINTIFF'S SUMMARY OF ALLEGATIONS ................ 3

III. RESPONSE TO PLAINTIFF'S LEGAL STANDARD .................................... 3

IV. THE COURT SHOULD DISMISS PLAINTIFFS' CAUSE OF
ACTION FOR NEGLIGENCE AGAINST DEFENDANT AS
PLAINTIFFS HAVE NOT PLED SUFFICIENT FACTS WHICH
GIVER RISE TO A DUTY AS A MATTER OF LAW ................................... 4

    A. Whether The Special Relationship Arises From The Landlord-
Tenant Relationship Or From An Affirmative Undertaking, The
Duty Analysis Is The Same.................................................................. 4

    B. Defendant Did Not Have Actual Knowledge That Specific Third
Party Violence Was Likely To Occur .................................................. 6

    C. Defendant Did Not Have A Duty To Perform Even The
Additional Measures Plaintiffs Have Set Forth In Their
Opposition ............................................................................................ 7

    D. Plaintiffs' Attempt To Minimize The Undue Burden Placed On
Defendant To Perform Plaintiffs' Proposed Measures Should Be
Rejected................................................................................................ 9

    E. Rodgers' Homicidal Rampage, Which Began With The Violent
Attacks Upon Hong, Wang, and Chen, Were Not Foreseeable By
Defendant ........................................................................................... 11

V. THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR
FURTHER LEAVE TO AMEND THEIR COMPLAINT ............................ 11

VI. CONCLUSION ............................................................................................... 12

i

1

# TABLE OF AUTHORITIES

2                                                                                              **Page**

3

## FEDERAL CASES

4
Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ..........3

5
Holden v. Hagopian, 978 F.2d 1115 (9th Cir. 1992)....................................................6

6
In re Connetics Corp. Sec. Litig., 542 F. Supp. 2d 996 (N.D. Cal. 2008) ..................8

7
Munson v. Gaetz, 673 F.3d 630 (7th Cir. Ill. 2012) .....................................................4

8
Swanson v. Bixler, 750 F.2d 810 (10th Cir. 1984).......................................................6

9

10

## STATE CASES

11
Artiglio v. Corning Inc., 18 Cal.4th 604 (1998)...........................................................5

12
Castaneda v. Olsher, 41 Cal.4th 1205 (2007).........................................................4, 7

13
Davis v. Gomez, 207 Cal.App.3d 1401 (1989) ...........................................................10

14
Delgado v. Trax Bar & Grill, 36 Cal. 4th 224 (2005) ..................................................5

15
Gill v. New York City Housing Authority, 130 A.D. 2d 256, 519 N.Y.S.2d
        364 (1987) ..........................................................................................................10

16
Jackson v. AEG Live, LLC, 233 Cal. App. 4th 1156 (2015) ........................................5

17
Johnson v. City & County of San Francisco, 137 Cal.App.4th 7 (2006)...................10

18
Margaret W. v. Kelley R., 139 Cal. App. 4th 141 (2006) ....................................4, 5, 7

19
Pettus v. Cole, 49 Cal. App. 4th 402 (1996)...............................................................10

20

21

## STATUTES

22
California Government Code § 12926................................................................10

23
California Government Code § 12955.3.............................................................10

24
Government Code §12955 ..................................................................................10

25

26

## RULES

27
Fed.R.Civ.P. 26(a)(1).........................................................................................11

28

ii

1

Fed.R.Civ.P. 26(e)(1)(A) ................................................................................................11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        During the approximate 2 years and 10 months that Elliot Rodger ("Rodger")

4  lived at the Capri [FAC ¶¶ 21, 41], he had 9 roommates [FAC ¶¶ 21, 22, 23, 28, 36].

5  Only one of those roommates, Horowitz, who was Rodger's fifth roommate, made a

6  complaint to defendant about Rodger.  [FAC ¶25].  Horowitz's complaint was made

7  in January of 2012.  [FAC ¶¶ 25].  Rodger's homicidal rampage occurred on May

8  23, 2014, approximately 1 year and 5 months later, and 4 roommates after

9  Horowitz's complaint was made.

10        The only other complaints during this 2 year and 10 month period when

11  Rodger lived at the Capri were made by Rodger himself.  In August of 2011, Rodger

12  complained to the leasing manager that one of his new Hispanic roommates tried to

13  strike him [FAC ¶22].  Shortly thereafter Rodger was allowed to sign a lease with

14  defendant for another apartment.  [FAC ¶22].  And on January 15, 2014, Rodger

15  called the police to complain that Hong had stolen from him.  [FAC ¶37].

16  Assuming arguendo that defendant had actual knowledge of this call by Rodger to

17  law enforcement [¶37], this event does not support the duty plaintiffs urge.  The fact

18  that law enforcement was called is no basis to conclude that Rodger posed a danger

19  to his roommates (or vice versa).  And the fact that the call resulted in Hong being

20  arrested for stealing from Rodger certainly does not create a duty to "evict" Rodger,

21  as plaintiffs contend.

22        Plaintiffs further allege Capri's apartment manager overheard Rodger yelling

23  after losing the lottery on September 11, 2012, [FAC ¶27], and cursing his assailants

24  after he was pushed off a balcony at one house by several males students, and

25  assaulted at another house by its occupants, on July 20, 2013.  [FAC ¶34].  But

26  neither instance constitutes conduct by Rodger which was directed toward a

27  roommate or other resident of Capri, and as shown in the moving papers, the law

28  does not recognize such acts as creating the duty urged.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

1    Likewise, plaintiffs allege that defendant was aware that law enforcement was

2    at the apartment to conduct a welfare check on Rodger on April 30, 2014 [FAC

3    ¶40].  This event also does not support the duty plaintiffs urge.  The fact that law

4    enforcement was called to check on Rodger's welfare is no basis to conclude that

5    Rodger posed a danger to his roommates.  And the fact that their investigation

6    "affirmed that Rodger was not dangerous" [FAC ¶40] certainly does not create a

7    duty to "warn" that Rodger was dangerous.

8    Plaintiffs' opposition repeatedly points to the Horowitz letter.  [FAC ¶25].

9    The opposition simultaneously declares it to be dispositive ("even if none of these

10   other instances had occurred at all, the letter could stand on its own"), and yet

11   dangles it, still shrouded, so as to beckon another amendment ("Plaintiffs are now

12   able to amend… to include specific language of the warning").  Plaintiffs have

13   already alleged that the Horowitz letter opines that Rodger posed a danger "to

14   Horowitz."  But plaintiffs also allege that this letter was responded to by defendant,

15   and admit that for the next one year and five months thereafter, all that defendant

16   actually knew was that everything was fine between Rodger and his four subsequent

17   roommates.  Thus, rather than being dispositive, the Horowitz letter is irrelevant.

18   Further, if this letter were as important as plaintiffs claim, their opposition papers

19   should have disclosed what the "specific language of the warning" was, or attached

20   a copy of the letter, to support their request for leave to file a second amended

21   complaint.  Instead, plaintiffs elected to stand on their first amended complaint.

22   While Elliot Rodger's story is disturbing to look back upon, the facts actually

23   known to defendant at the time were similar to those encountered at virtually all

24   housing near college campuses nearly every day.  The facts alleged, accepted as

25   true, did not make foreseeable to the owner of a private apartment complex a young

26   man's violent rampage that those with far greater information and expertise  did not

27   see coming.  Nothing in plaintiffs' opposition changes this conclusion.

28

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

2

**II.     RESPONSE TO PLAINTIFF'S SUMMARY OF ALLEGATIONS**

Contrary to plaintiffs' opposition [Opp. 4:16-17], defendant's motion did refer to plaintiffs' allegations concerning defendant's act of pairing or assigning roommates.  [See, e.g., Doc. 50: 4:19-20; 4:25-5:1; 5:4; 5:11-12; 6:10-12; 7:15-16].

Plaintiffs' opposition also contains several misstatements and omissions as to the allegations of plaintiffs' first amended complaint ("complaint") as to several of the alleged incidents.

As to the Hispanic roommate incident, while plaintiffs allege that "Rodger instigated a *serious conflict* between himself and his new roommates" [Opp. 5:2-4], plaintiffs leave out the factual allegation that the only person to demonstrate a propensity for violence in this incident was the one Hispanic roommate who had to be restrained by the other.  [FAC ¶22].

Plaintiffs omit factual allegations [Opp. 6:2-5] that Rodger's conduct during the September 11, 2012 incident, was out of frustration when he did not win a lottery jackpot drawing [FAC ¶27], and was not the result of any roommate conflict.

And as to the January 15, 2014 incident, plaintiffs leave out factual allegations that before Rodger placed Hong under "citizen's arrest" and called the SBCSD, Hong escalated this conflict when he took personal property -- candles and candle holders -- belonging to Rodger.  [¶37].

**III.     RESPONSE TO PLAINTIFF'S LEGAL STANDARD**

Plaintiffs rely on Erickson v. Pardus, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) for the proposition that under Fed. R. Civ. P. 8,  a complaint need only provide the defendant with "fair notice of what the… claim is and the grounds upon which it rests.'" [Opp. 8:25-9:1].  However, Erickson dealt with a pro se plaintiff, and  the decision specifically indicated that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson, supra, 551 U.S. at 93.  Plaintiffs' complaint should be held to the standards for pleadings "drafted by lawyers."  Lee v.

3

1  City of Richmond, 2013 U.S. Dist. LEXIS 38085, *12, n. 2, 2013 WL 1155590

2  (E.D. Va. Mar. 19, 2013).

3       Further, on a motion to dismiss, "We accept well-pleaded facts as true *but not*

4  *legal conclusions or conclusionary allegations that merely recite a claim's elements*.

5  [citations]."  Munson v. Gaetz, 673 F.3d 630, 632-633 (7th Cir. Ill. 2012) (emphasis

6  added).

7  **IV.    THE COURT SHOULD DISMISS PLAINTIFFS' CAUSE OF ACTION**

8            **FOR NEGLIGENCE AGAINST DEFENDANT AS PLAINTIFFS HAVE**

9            **NOT PLED SUFFICIENT FACTS WHICH GIVER RISE TO A DUTY**

10            **AS A MATTER OF LAW**

11        **A.    Whether The Special Relationship Arises From The Landlord-**

12             **Tenant Relationship Or From An Affirmative Undertaking, The**

13             **Duty Analysis Is The Same**

14       Plaintiffs' opposition [Opp. 10:18-21] asserts that "[t]he extent of a landlord's

15  duty in these circumstances is *also* framed by the 'negligent undertaking' (or Good

16  Samaritan) doctrine…."  (emphasis added).  Plaintiffs' opposition [Opp. 11:1-4]

17  further asserts that "Capri's affirmative action of pairing the roommates together

18  *assumed an even higher level of duty* (*and a lower level of needed foreseeability*)

19  than existed by virtue of the landlord-tenant relationship alone."  (emphasis added).

20       Defendant already acknowledged in its moving papers that the landlord and

21  tenant relationship is a special relationship.  Castaneda v. Olsher, 41 Cal.4th 1205,

22  1213 (2007).  The "negligent undertaking" or "Good Samaritan" doctrine relied

23  upon by plaintiff is merely another way of creating a special relationship.  "The

24  Supreme Court has suggested that if the elements of a voluntary undertaking are

25  satisfied, that is another way of creating a 'special relationship.' [citation]."

26  Margaret W. v. Kelley R., 139 Cal. App. 4th 141, 162-163 (2006).  Once a special

27  relationship is established, *the same tests apply*.  Margaret W., supra, 139 Cal. App.

28  4th at 155, n. 17.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

1      The negligent undertaking doctrine does not, contrary to plaintiffs' argument,

2   impose a "higher level of duty" nor "a lower level of needed foreseeability." [Opp.

3   11:1-4].  "As we have said, whatever the source of a special relationship may be, the

4   same tests apply to determine whether a duty exists. [citation].  At most, the

5   existence of a voluntary undertaking satisfying the conditions for liability would

6   lead us to analyze the Rowland factors. [citation].  We have done so *ante* and

7   concluded that there was no duty."  Margaret W., supra, 139 Cal. App. 4th at 163.

8      "[F]oreseeability remains a highly relevant factor—even in cases in which a

9   legal duty is found (*and regardless of the doctrine under which it is found*)."

10   Delgado v. Trax Bar & Grill, 36 Cal. 4th 224, 250 (2005) (emphasis added).

11      Plaintiffs' opposition sets forth the elements of a negligent undertaking [Opp.

12   9:27-10:27], but  fails to acknowledge this doctrine's qualifications and limitations.

13      Preliminarily, the negligent undertaking doctrine is disfavored.  "It is

14   important to 'note that the negligent undertaking doctrine is not favored in the law,

15   and many cases discussing its principles … have refused to apply it.'  [citations]."

16   Jackson v. AEG Live, LLC, 233 Cal. App. 4th 1156, 1175-1176 (2015).

17      Further, "[i]n order for liability to be imposed upon the actor 'under a

18   negligent undertaking theory,' he must *specifically have undertaken to perform the*

19   *task that he is charged with having performed negligently*, for without the actual

20   assumption of the undertaking there can be no correlative duty to perform that

21   undertaking carefully."  Artiglio v. Corning Inc., 18 Cal.4th 604, 614–615 (1998)

22   (emphasis added).

23      Here, the specific task which defendant undertook was to pair tenants in an

24   apartment; specifically, defendant assigned Hong and Wang with Rodger to live in

25   Apt. No. 7.[1]    Defendant did not also assume the task of informing or warning Hong

26

27   [1] Plaintiff's opposition asserts that Hong and Wang did not know Rodger and did not

28   request to be paired with Rodger [Opp. 11:5-8].  There is no such allegation in

1   and Wang of Horowitz's problems with Rodger as a roommate. [Opp. 11:12-16].  As

2   plaintiffs acknowledge in their opposition, defendant paired Hong and Wang with

3   Rodger "to further the commercial interest of running their student housing

4   enterprise" [Opp. 11:8-10].  This same commercial interest enables defendant to

5   provide affordable housing in Santa Barbara for the benefit of students attending

6   nearby colleges and universities who do not have anyone with whom to share an

7   apartment, and as an alternative to on-campus student housing for those who choose.

8       **B.**    **Defendant Did Not Have Actual Knowledge That Specific Third**

9           **Party Violence Was Likely To Occur**

10       "Although we are obliged to presume that all factual allegations in appellants'

11   complaint are true, [citation], we do not 'have to accept every allegation in the

12   complaint as true in considering its sufficiency; rather,. . . [we] will examine

13   whether conclusory allegations follow from the description of facts as alleged by the

14   plaintiff.' [citations]" Holden v. Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992).

15   "All well-pleaded facts, as distinguished from conclusory allegations, must be taken

16   as true.  [citation]."  Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir. 1984).

17       Plaintiffs allege that in January of 2012, Horowitz "began to fear for *his*

18   personal safety" and informed his father that "Rodger was mentally ill and posed a

19   'threat' of violence."  [FAC ¶25] (emphasis added).  Horowitz and his father took

20   action "to remove Horowitz from *his* living situation due to the danger posed by

21   Rodger."  [FAC ¶25] (emphasis added).  Horowitz and his father communicated to

22   defendant "that Rodger was a threat and that he posed a danger *to Horowitz*".  [FAC

23   ¶25] (emphasis added).  Contrary to plaintiffs' opposition [Opp. 13:17-14:9], the

24   allegations of the complaint demonstrate only that Horowitz communicated to

25   defendant that he perceived a threat or danger *to himself* from Rodger; not that

26   Rodger was a threat or danger to "any roommate he was paired with" as plaintiffs

27   _____

28   plaintiffs' first amended complaint.

6

1    would now contend.  [Opp. 14:9].

2         Plaintiffs agree that "foreseeability must be measured by what the defendant

3    actually knew."  Margaret W., supra, 139 Cal.App.4th at 156.  [Opp. 14:24-25].

4    Plaintiffs allege that Horowitz and his father communicated to defendant "through

5    written correspondence that Rodger was a threat and that he posed a danger to

6    Horowitz."  [FAC ¶25].  Defendant did not obtain actual knowledge from this letter

7    that Rodger was a threat or danger to "any roommate he was paired with".

8         As to the remaining five incidents which plaintiffs rely upon in support of

9    their claim that defendant had actual knowledge of Rodger's propensity for violence

10   [Opp. 15:13-22], plaintiffs now assert that "these instances primarily serve to add

11   gravity and credibility" to the Horowitz letter.  [Opp. 15:13-22].  Defendant has

12   discussed these five other incidents at length in the moving papers and demonstrated

13   that they did not convey actual knowledge to defendant of Rodger's propensity for

14   violence.  Further, the Horowitz letter does not stand on its own as actual knowledge

15   to defendant that Rodger was a threat or danger to anyone other than Horowitz.

16   [Opp. 16:14-17].

**C.    Defendant Did Not Have A Duty To Perform Even The Additional**
**       Measures Plaintiffs Have Set Forth In Their Opposition**

19        Plaintiffs acknowledge in their opposition [Opp. 12:24-13:2] that "[t]he duty

20   analysis…requires the court in each case (whether trial or appellate) to identify the

21   specific action or actions the plaintiff claims the defendant had a duty to

22   undertake…. '" (Castaneda, supra, 41 Cal. 4th at 1214), and that "[f]irst, the court

23   must determine the specific measures the plaintiff asserts the defendant should have

24   taken to prevent the harm. This frames the issue for the court's determination by

25   defining the scope of the duty under consideration."  Castaneda, supra, 41 Cal. 4th at

26   1214.

27        "Although duty is a legal question, the factual background against which we

28   decide it is a function of a particular case's procedural posture."  Castaneda, supra,

7

1   41 Cal. 4th at 1214.  Generally, on a motion to dismiss, a district court must

2   consider only the facts stated in the plaintiffs' complaint.  In re Connetics Corp. Sec.

3   Litig., 542 F. Supp. 2d 996, 1002 (N.D. Cal. 2008).

4          Plaintiffs alleged various specific measures which they contended should

5   have been performed by defendant.  [FAC ¶¶ 36, 53, 56].  Defendant addressed each

6   of those specific measures in its moving papers, and demonstrated the undue burden

7   that each of those measures would impose upon it.

8          In their opposition papers, plaintiffs propose additional specific measures to

9   those set forth in their complaint.  [Opp. 17:5-18:4].[2]

10         Plaintiffs alleged in their complaint that defendant "failed to warn Hong or

11   Wang or their parents of the *mental illness*, racial biases, and dangerous propensities

12   of Rodger"  [FAC ¶53], "failed to warn Hong and Wang that Rodger had had serious

13   conflicts with his previous *roommates* and that Capri had been warned that he was

14   not only a *racist* but also *potentially violent and dangerous*"  [FAC ¶36] and

15   "breached their duty" to "warn Hong and Wang of Rodger's *unstable and violent*

16   *demeanor*" [FAC ¶56].  In their opposition, plaintiffs allege that defendant should

17   "[s]imply communicate to Hong and Wang that Capri had been informed that

18   Rodger 'was a threat' and 'posed a danger' to one of his former roommates."  [Opp.

19   17:17-21].

20         In their complaint plaintiffs allege that defendant "failed to conduct any kind

21   of reasonable background check or reasonable investigation of Rodger's online

22   postings to ensure that he was an appropriate and safe roommate" [FAC ¶36] and

23   "breached their duty to properly conduct a background check and conduct a

24   reasonable investigation of Rodger" [FAC ¶56].  In their opposition, plaintiffs allege

25   that defendant should "investigate Rodger to be better informed about his suitability

26   _____

27   [2] In fact, the only specific measure appearing in both plaintiffs' complaint [FAC ¶¶
28   36, 53] and their opposition [Opp. 18:4] is that defendant "failed to evict Rodger".

1  as a roommate and tenant, and to better judge the credibility of the warning given by

2  Horowitz, in order to determine what other actions must be taken (this could include

3  simple internet searches or checks of social media- cost free to the defendant)."

4  [Opp. 17:22-27].

5       In their complaint plaintiffs alleged that defendant "failed to house Rodger

6  separately from other roommates he posed a potential threat to" [FAC ¶36] and

7  "failed to segregate Rodger into his own living quarters"  [FAC ¶53].  In their

8  opposition plaintiff allege that defendant should "arrange for Rodger to remain a

9  tenant, but to decline to pair him with other roommates" [Opp. 18:1-2] or "let

10  Rodger's lease expire and decline to extend or continue his tenancy".  [Opp. 18:3-4].

11       While the Court should consider only the specific measures alleged in

12  plaintiffs' complaint in defining the scope of defendant's duty, the additional specific

13  measures alleged in plaintiffs' opposition in defining the scope of defendant's duty

14  fare no better.

15       **D.      Plaintiffs' Attempt To Minimize The Undue Burden Placed On**

16       **Defendant To Perform Plaintiffs' Proposed Measures Should Be**

17       **Rejected**

18       The warning which plaintiffs allege in their complaint  should have given by

19  defendant was "to warn Hong or Wang or their parents of the *mental illness*, racial

20  biases, and dangerous propensities of Rodger"  [FAC ¶53] (emphasis added), "to

21  warn Hong and Wang that Rodger had had serious conflicts with his previous

22  *roommates* and that Capri had been warned that he was not only a *racist* but also

23  *potentially violent and dangerous*"  [FAC ¶36] (emphasis added) and to "warn Hong

24  and Wang of Rodger's *unstable and violent demeanor*" [FAC ¶56] (emphasis

25  added).  In their opposition, plaintiffs allege that that the warning that should have

26  been given by defendant was "[s]imply communicate to Hong and Wang that Capri

27  had been informed that Rodger 'was *a threat*' and 'posed *a danger*' *to one of his*

28  *former roommates*."  [Opp. 17:17-21] (emphasis added).

9

1    Either warning which plaintiffs would have had defendant pass on to Hong

2    and Wang about Rodger would necessarily have included conclusory opinions that

3    Rodger was unstable and  had a violent demeanor.  While it is true that passing

4    along one person's accusations against another is always virtually cost-free, and

5    requires only a small amount of time, plaintiffs' position  that defendant has a duty

6    to republish such information as truth without any investigation is legally improper.

7    As set forth more fully in its moving papers, by doing so defendant would face

8    substantial risks of  litigation for violating a tenant's right to privacy under Article I,

9    Section 1 of the California Constitution (Pettus v. Cole, 49 Cal. App. 4th 402, 440

10   (1996)), and unlawfully discriminating against a tenant on the basis of their

11   disability under California Fair Employment and Housing Act.  California

12   Government Code § 12955.3; §12955, subdivisions (a) and (k); California

13   Government Code § 12926 (j); Johnson v. City & County of San Francisco, 137

14   Cal.App.4th 7, 17 (2006).  Furthermore, defendant is not professionally qualified to

15   make such determinations in the first instance.

16       Defendant could no more assume the truth of the allegations in the Horowitz

17   letter as to Rodger, than it could assume the truth of information that it might have

18   found had it conducted an investigation of Rodger on the Internet and social media.

19   Gill v. New York City Housing Authority, 130 A.D. 2d 256, 263, 519 N.Y.S.2d 364

20   (1987).  Lacking these qualifications, defendant would be forced incur a substantial

21   financial burden in hiring mental health professionals for this purpose.

22       Further, and contrary to plaintiffs' opposition [Opp. 18:22-24], it is the

23   allegations of plaintiffs' complaint which conflate Rodger's mental illness and

24   likelihood to commit violence.  Plaintiffs allege that Horowitz believed Rodger was

25   mentally ill and posed a threat of violence and danger to Horowitz.  [FAC ¶25].

26   Further, plaintiffs also alleged in their complaint various incidents of bizarre

27   behavior on the part of Rodger. Thus, plaintiffs fail to distinguish this case from

28   Davis v. Gomez, 207 Cal.App.3d 1401, 1406 (1989).  [Opp. 19:8-19].

10

1    **E.    Rodgers' Homicidal Rampage, Which Began With The Violent**

2          **Attacks Upon Hong, Wang, and Chen, Were Not Foreseeable By**

3          **Defendant**

4          Contrary to plaintiffs' opposition [Opp. 21:12-13; 23:9-12], plaintiffs allege in

5    their complaint that Rodger's homicidal attacks on Hong, Wang, and Chen was part

6    and parcel of Rodger's subsequent homicidal attacks.  Plaintiffs allege in their

7    complaint that that the killing of their sons were all part of Rodger's "Day of

8    Retribution", which Rodger had been planning since November of 2012 [FAC ¶30]

9    and which he carried out on May 23, 2014, as planned [FAC ¶¶ 38, 41].  The fact

10   that Rogers used knives and other weapons against Hong, Wang and Chen in the

11   apartment, and then switched to guns after leaving the apartment to kill three more

12   people [FAC ¶41], is not sufficient to separate these homicides from Rodger's "Day

13   of Retribution".

14         Contrary to plaintiff's opposition [Opp, 22:20-21], the harm to decedents

15   could not have been prevented by a simple warning to Hong and Wang about

16   Rodger being "a threat" and posing "a danger" to one of his former roommates.

17   **V.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR**

18         **FURTHER LEAVE TO AMEND THEIR COMPLAINT**

19         While plaintiffs assert that they came into possession of the Horowitz letter

20   after filing their first amended complaint on May 20. 2015 [Opp. 24:4-5], plaintiffs

21   did not specifically identify this letter in their initial disclosure pursuant to

22   Fed.R.Civ.P. 26(a)(1) served on June 1, 2015, and have not produced a copy of the

23   Horowitz letter to defendant despite its continuing obligation to do so under

24   Fed.R.Civ.P. 26(e)(1)(A).  Plaintiffs' counsel referred to the Horowitz letter during a

25   telephonic meet and confer on June 1, 2015, and an in-person meet and confer on

26   June 4, 2015, with defendants' counsel.  On both occasions, however, counsel did

27   not produce the letter.

28         As plaintiffs maintain that they have sufficiently pled the Horowitz letter in

1 their complaint [Opp. 24:6-8], they should not be allowed leave to amend on this

2 basis.

3 **VI.    CONCLUSION**

4         None of the duties alleged in the complaint or argued in the opposition were

5 owed to plaintiffs' decedents.  In resolving the foreseeability issue before this

6 honorable Court, no "propensity for violence" should have been foreseen as a matter

7 of law by the owner of a private apartment complex under these facts.  When

8 Horowitz complained he felt unsafe, he was allowed to move.  Upon resolving

9 Horowitz's situation, no complaints whatsoever, over the course of nearly a year and

10 a half, came from either of the next two pairs of Rodger's roommates.  Nor did

11 either of the two visits over that time by law enforcement, the experts if anyone on

12 recognizing criminal propensities, make a propensity for a rampage foreseeable.

13 Their first visit resulted in the arrest of Hong (who himself was not concerned about

14 angering Rodger, lest he would not have taken his belongings). And in the second

15 visit, the wellness check, law enforcement "affirmed that Roger was not dangerous

16 [FAC¶ 40]."Accordingly, this Court should sustain defendant's motion to dismiss

17 plaintiffs' first amended complaint.

18

19 DATED:  June 29, 2015            **MANNING & KASS**
                                  **ELLROD, RAMIREZ, TRESTER LLP**
20

21                                By:    _____/s/ Eugene J. Egan_____

22                                       Eugene J. Egan, Esq.
                                        Attorneys for Defendant HI DESERT
23                                       MOBILE HOME PARK LP (erroneously
                                        sued as "CAPRI APARTMENTS AT ISLA
24                                       VISTA")

25

26

27

28

12